**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **SEBASTIAN SOULAS, individually, and on behalf of those similarly situated,** | **CASE NO.:** |
| **Plaintiff,** | **CLASS ACTION** |
| | **CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE, RELIEF** |
| **v.** | |
| | **DEMAND FOR JURY TRIAL** |
| **JUUL LABS, INC., a Delaware corporation f/k/a PAX LABS, INC. f/k/a PLOOM PRODUCTS, INC., and PAX LABS, INC., a Delaware corporation f/k/a PAX LABS (DEUX), Inc.,** | |
| **Defendants.** | |

## Table of Contents

I.      INTRODUCTION ................................................................................. 1

II.     PARTIES ...............................................................................................

    A.      Plaintiff, Sebastian Soulas

    B.      Defendant, JUUL Labs, Inc. ..................................................

    C.      Defendant, PAX Labs, Inc. ...................................................

III.    JURISDICTION AND VENUE ........................................................... 6

IV.     FACTUAL ALLEGATIONS – BACKGROUND ............................... 7

    A.      Why Nicotine is so Powerfully Addictive ............................... 7

    B.      Traditional E-Cigarettes & Nicotine Delivery ...................... 10

    C.      JUUL Changes The E-Cigarette Landscape ........................ 12

    D.      The Dangers of E-Cigarettes ................................................ 18

    E.      E-Cigarettes Are Particularly Dangerous To the Youth Market ............................ 20

V.      FACTUAL ALLEGATIONS – JUUL ............................................... 22

    A.      Youth–Oriented Design and Kid–Friendly Flavors ............... 24

    B.      JUUL's Nicotine Load ........................................................... 28

C.    JUUL's Advertising Campaign ..................................................... 32

1.    *Vaporized Campaign* ................................................................ 32

2.    *Launch Party* ........................................................................... 35

3.    *Print Advertisements* ............................................................... 38

4.    *Social Media & Influencers* ...................................................... 40

5.    *Website and Emails* ................................................................. 43

6.    *Results of the Advertising Campaign* ........................................ 45

VI.    **AFTERMATH – THE EPIDEMIC** ...................................................... 46

VII.    **PLAINTIFF HAS SUFFERED DAMAGES AND REQUIRES DIAGNOSTIC  TESTING AND MITIGATION** ...................................... 50

VIII.    **CLASS ACTION ALLEGATIONS** ........................................................ 52

IX.    **CAUSES OF ACTION** ........................................................................ 57

X.    **DEMAND FOR JURY TRIAL** ............................................................ 64

XI.    **PRAYER FOR RELIEF** ..................................................................... 64

Plaintiff, individually, and on behalf of those similarly situated, brings this class action lawsuit against JUUL Labs, Inc. and PAX Labs, Inc. ("JUUL") based upon personal knowledge as to himself, and on information and belief derived from, among other things, the investigation of counsel and review of public documents as to all other matters.

## I.    INTRODUCTION

1.    Nicotine is a highly addictive drug.

2.    According to the United States Food and Drug Administration (FDA), no nicotine products are safe for use by children and the youth market.[1]

3.    Notwithstanding this warning, JUUL Labs entered the electronic cigarette market in 2015 with a trendy, youth-oriented e-cigarette that was easy to use, easy to share and easy to conceal. More importantly, it carried one of the highest doses of nicotine available on the market and was coupled with a patented formulation that enabled its aerosolized nicotine to be easily inhaled and rapidly absorbed. Faced with better-funded and more established Big Tobacco-backed competitors, JUUL made a purposeful decision. Instead of marketing its product to existing smokers as a tobacco alternative and/or tobacco cessation device, JUUL targeted the youth market, one who had turned its back on cigarettes. JUUL's decision would inure to its benefit, but at a significant cost to young persons, their parents and society.

4.    Armed with a youth-oriented design, a highly addictive substance, and an aggressive youth-directed marketing campaign, JUUL quickly rose from a relatively obscure startup, to a company now valued at $38 billion dollars.[2] During this period, JUUL posted an extraordinary number of advertisements, promoted its product via paid influencers, and distributed its messaging broadly across social media via various youth-directed hashtags, such as #vaporized, #LightsCameraVapor,

---

[1] U.S. Food & Drug Administration, Nicotine: *The Addictive Chemical in Tobacco Products*, June 24, 2019, https://www.fda.gov/tobacco-products/products-guidance-regulations/nicotine-addictive-chemical-tobacco-products.

[2] *Altria nears Juul stake deal, valuing it at $38 billion*, Reuters (December 19, 2018), https://www.reuters.com/article/us-juul-altria-group-m-a/altria-nears-juul-stake-deal-valuing-it-at-38-billion-sources-idUSKCN1OI2CC; S*ee, also* Jackler, *JUUL Advertising (2015-2018)*.

CLASS ACTION COMPLAINT

#mangomonday and #fruitfriday.[3] Brazenly touting itself as the *"most educated," "the most diligent [and] the most well-researched"* e-cigarette company, JUUL recognized that the youth market was an untapped resource and a critical driver of revenue growth.[4] Indeed, JUUL's marketing efforts were so successful, and its product so pervasive among young persons that "JUULing"—the act of smoking a JUUL—had become part of Generation Z's lexicon.

5.     JUUL successfully created an image that its use was edgy, cool, fun, and pleasurable, both physically and emotionally, "faithfully recapitulat[ing] the playbook [used] by traditional cigarette marketers" 50 years earlier.[5] Capitalizing on the billions of dollars, decades of social outreach, and educational efforts by government and the public health community to convince young persons that tobacco smoking was bad, JUUL "[p]osition[ed] itself as the rebel outsider seeking to disrupt the tobacco industry while saving billions of lives…" a tactic that formed "a core element of the brand's appeal to youth."[6]

6.     While touting the virtues of JUULing, Defendants purposefully failed to disclose that they were selling a highly addictive product that was specifically designed to deliver an easily inhalable, unconscionably high dose of nicotine that would be rapidly absorbed by the body, and would quickly addict its users. Defendants also failed to disclose the host of toxic compounds in is aerosolized nicotine formulation that would invariably expose users to a range of medical maladies.

7.     JUUL had created the perfect storm—a highly addictive drug, sweet to the taste, gentle on the throat, fun to smoke, essentially odorless and easy to conceal. JUUL aggressively marketed that product to our youth, most of whom had never smoked cigarettes and would otherwise never have become addicted to nicotine. Indeed, in less than three years, JUUL became the most popular e-cigarette maker in the U.S., controlling more than 75 percent of the e-cigarette market and achieving

---

[3] Jackler, *JUUL Advertising (2015-2018)*

[5] Jackler, *JUUL Advertising (2015 – 2018)* at 39.

[6] Jackler, *JUUL Advertising (2015 – 2018)* at 33.

a corporate valuation of $38 billion.[7] Over the 12-month period ending August 2018, JUUL sold $1.29 billion worth of devices and pods and enjoyed an annual sales increase of 783%. Unfortunately, JUUL's meteoric rise and economic gain came at a great cost to Plaintiff, the Class, and youth across the United States.

8.    E-cigarettes now have become the most commonly used tobacco product among youth.[8] The U.S. Surgeon General's Report on e-cigarette use among young persons unequivocally concluded that e-cigarettes are unsafe for children, adolescents, and the young persons and that those who use e-cigarettes are significantly more likely to go on to use traditional cigarettes—a product that kills half of its long-term users. Although JUUL repeatedly claimed that its product was designed for adult smokers seeking an alternative to cigarettes, by 2016 more than two million middle and high school students, many of whom had never smoked, had tried e-cigarettes.[9]

9.    In November 2018, the Centers for Disease Control and Prevention (CDC) reported that e-cigarette use among American high school students reached 20.8% (3.05 million users) representing a 78% increase from the prior year.[10] The FDA warned that underage vaping, spurred in large part by JUUL Labs, had become a crisis of epidemic proportions.

10.    Significantly, CDC reports on tobacco use among high school students show that the JUULing youth market had not been enticed away from Big Tobacco's base of youth cigarette smokers

---

[7] Carver R., *Juul expands top U.S. e-cig market share; traditional cigarettes volume continues to slip,* Winston Salem Journal (November 27, 2018), https://www.journalnow.com/business/juul-expands-top-u-s-e-cig-marketshare- traditional/article_9bdfd55c-68b5-5c08-aeb8-edb4a616ca9e.html (last visited July 29, 2019); *See also,* Primack, D., *Scoop: The numbers behind Juul's investor appeal,* Axios (July 2, 2018), https://www.axios.com/numbers-juul-investor-appeal-vaping-22c0a2f9-beb1-4a48-acee-5da64e3e2f82.html.

[8] Jenssen, P., *et al.,* American Academy of Pediatrics, *E-Cigarettes and Similar Devices,* Section on Tobacco Control, Pediatrics Volume 143, Number 2 (February 2019), www.aappublications.org/news.

[9] Brazier, A., *Are e-cigarettes a safe alternative to smoking?,* Medical News Today (June 25, 2018), https://www.medicalnewstoday.com/articles/216550.php.

[10] CDC, *Notes from the Field: Use of Electronic Cigarettes and Any Tobacco Product Among Middle and High School Students – United States, 2011–2018,* , Morbidity and Mortality Weekly Report ("MMWR") 67(45);1276–1277 (Nov. 16, 2018), https://www.cdc.gov/mmwr/volumes/67/wr/mm6745a5.htm?s_cid=mm6745a5_w.

but rather were newly created. By 2009, when e-cigarettes were virtually unknown, current cigarette use among high school students had declined from 35.4% in 1997 to 19.5%.[11] By 2012, more progress had been made and cigarette use among high school students dropped to 12.6% while only 2.8% of students used e-cigarettes.[12] By 2018, cigarette use had modestly dropped an additional 4.5%, (from 12.6% to 8.1%), but e-cigarette use had skyrocketed from 2.8% to 20.8%, meaning the increase in current e-cigarette use was four times greater than the decrease in conventional cigarette use.[13] Equally alarming, in the same time period (2012-2018) e-cigarette use among middle school students grew from 1.1% to 7.2%—a near sevenfold increase.[14]

11.     Sadly, there is direct correlation between youth e-cigarette use and eventual tobacco use. A February 2019 *JAMA* investigation concluded that e-cigarette use among teens is associated with increased risk for eventual cigarette use, even among children who otherwise would have been at low risk for cigarette initiation. Prior e-cigarette users were four times more likely to ever smoke a cigarette compared to youth with no prior tobacco use.[15]

12.     The CDC reported in February 2019, "[a]bout 4.9 million middle and high school students were current users (used in the past 30 days) of some type of tobacco product in 2018, up from 3.6 million in 2017. This increase—driven by a surge in e-cigarette use—erased past progress in reducing youth tobacco product use…. With the exception of e-cigarettes, no change was found in the use of other tobacco products, including cigarettes…. There were 1.5 million more youth e-cigarette

---

[11] CDC, *Cigarette Use Among High School Students – United States, 1991–2009, MMWR* 59(26);797-801 (July 9, 2010).

[12] CDC, *Cigarette Use Among High School Students – United States, 2011 and 2012, MMWR* 62 (45);893-97 (Nov. 15, 2013).

[13] CDC, *Vital Signs: Tobacco Product Use Among Middle and High School Students – United States, 2011-2018, MMWR* 68(6);157-164 (Feb. 15, 2019).

[14] *Id.*

[15] Berry, Kaitlyn, *et al.*, *Association of Electronic Cigarette Use With Subsequent Initiation of Tobacco Cigarettes in U.S. Youths*, JAMA Network Open, 2019(2): e187794. doi:10.1001/ jamanetworkopen.2018.7794 (Feb. 1, 2019), https://jamanetwork.com/journals/ jamanetworkopen/fullarticle/2723425?resultClick=3.

users in 2018 than 2017, and those who were using e-cigarettes were using them more often…."[16] Based on market share, more than 75% of these kids are using JUUL.

13.    Defendants knew that JUUL's e-cigarettes and pods were not safe under any circumstances for minors, youth, and non-smokers. Defendants were under a duty to disclose this material safety information based upon their exclusive knowledge and concealment which Defendants never disclosed to Plaintiff or the public at any time or place or in any manner.  Defendants hid that: (a) a JUUL pod effectively delivers more nicotine than a packet of cigarettes; (b) JUUL pods contain a special formulation of nicotine salts and benzoic acid specifically designed to deliver an otherwise intolerable level of nicotine while still maintaining a smooth smoking experience; (c) the amount and manner of nicotine provided in JUUL pods was highly addictive; and (d) the numerous additional deleterious health consequences associated with vaping.

14.    Plaintiff brings this action to redress harm to himself and the Class and Subclass defined below and to prevent future harm to others.

**II.    PARTIES**

**A.    Plaintiff, Sebastian Soulas**

15.    Plaintiff Sebastian Soulas is, and at all relevant times was, a resident of the State of Louisiana. Currently 21 years old, Sebastian began JUULing in August of 2017. At the very start of his freshman year at Louisiana State University, Sebastian notice that many students were JUULing.

16.    Sebastian became attracted to JUULing because of its popularity, its fruity taste and for the buzz it gave him. He smoked mango, mint, menthol and cucumber flavored JUUL pods and estimates that he would "hit" his JUUL at least ten to twenty times per hour. Sebastian prefer the flavored pods over the tobacco flavor.

17.    Sebastian estimates that he has spent hundreds of dollars on JUULing, and would routinely spend thirty dollars per week on replacement pods.

---

[16] CDC, *Progress Erased: Youth Tobacco Use Increased During 2017-2018,* (Feb. 11, 2019), https://www.cdc.gov/media/releases/2019/p0211-youth-tobacco-use-increased.html.

18.    When Sebastian first started JUULing, he was unaware that the nicotine levels contained in JUUL pods were so potent and addictive, and that JUUL had specifically been developed to maximize the addictive potential of nicotine. In fact, Sebastian was not concerned with the nicotine contained in JUUL pods because of their smooth and fruity flavors. Moreover, he was not aware that JUUL pods and JUUL's aerosol contain toxic compounds; nor was he aware of the attendant dangers of vaping.

19.    Sebastian is now addicted to nicotine and is unable to stop vaping despite numerous attempts to quit. As a result, his breathing has become, at times, obstructed and he routinely suffers from dry throat. Without regular nicotine dosing, he suffers from headaches, shaking, and irritability.

**B.    Defendant, JUUL Labs, Inc.**

20.    JUUL Labs, Inc., is a Delaware corporation with its principal address at 560 20th Street, San Francisco, CA 94107. JUUL originally was authorized to do business under the name Ploom Products, Inc. It changed its name to PAX Labs, Inc., and subsequently to JUUL Labs, Inc.  All allegations toward JUUL are inclusive of JUUL in its prior form as either Ploom Products, Inc. or PAX Labs, Inc., or both.

**C.    Defendant, PAX Labs, Inc.**

21.    PAX Labs, Inc., is a Delaware corporation with its principal address at 660 Alabama Street, San Francisco, CA 94110.

22.    At all relevant times, each Defendant was an agent, servant, representative, officer, director, partner, or employee of the other Defendant and, in performing the conduct complained of herein, was acting within the scope and course of its authority as such an agent, servant, representative, officer, director, partner, or employee, and with the permission and consent of each other Defendant.

**III.    JURISDICTION AND VENUE**

23.    **Subject Matter Jurisdiction.** This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The named Plaintiff has a different citizenship from

Defendants and there are thousands of putative class members, some of whom have different citizenship from Defendants.

24.    **Personal Jurisdiction.** This Court has jurisdiction over Defendants. Through their business operations in this District, Defendants intentionally avail themselves of the markets within this District and have carried out business activities within this District that form the basis of this action so as to render the exercise of jurisdiction by this Court just and proper.

25.    **Venue.** Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) and (c)(2) because all Defendants reside in this State and District and because a substantial part of the events and omissions giving rise to this action occurred in this District.

## IV.    FACTUAL ALLEGATIONS – BACKGROUND

### A.    Why Nicotine is so Powerfully Addictive

26.    Nicotine is an alkaloid—a class of plant-derived nitrogenous compounds that includes caffeine, cocaine, morphine, and ephedrine.

27.    The modes of nicotine delivery are similar for conventional combustion cigarettes and e-cigarettes—namely, inhalation of a nicotine-laden aerosol ("smoke" in the case of cigarettes and "vapor" in the case of e-cigarettes). The uptake and biological distribution of nicotine are influenced by many of the same factors for both.[17]

28.    In conventional combustion cigarettes, nicotine is distilled from burning tobacco and delivered either on tar droplets (called particulate matter) or as a gas (in the so-called gas or vapor phase of the smoke aerosol). The pH of smoke largely determines the partition of nicotine into the particulate and gas phases. In an acidic environment most of the nicotine is in its ionized form (also called protonated or bound nicotine). In an alkaline environment the nicotine tends to be un-ionized (also called unprotonated or freebase nicotine).

---

[17] While the industry refers to this mode of delivery as "vapor" or "vaping," "[t]hese terms are actually misnomers as the aerosol produced is technically not a vapor. The aerosol produced by e-cigarettes has a particulate phase, not just a gas phase like a vapor." Orellana-Barrios M., *et al.*, *Electronic Cigarettes—A Narrative Review for Clinicians,* Am. J. Med. (2015) 128(7):674-81, https://www.amjmed.com/article/S0002-9343(15)00165-5/pdf.

29.    Protonated/bound nicotine does not readily absorb into membranes and therefore it tends not to be absorbed through the mouth during smoking (or vaping) even if held in the mouth. Accordingly, an acidic aerosol, whether smoke or vapor, delivers a greater proportion of available nicotine to the lungs where it is rapidly absorbed; whereas a more alkaline aerosol delivers more freebase nicotine, a greater proportion of which is absorbed through the buccal membranes. For example, because American-blend cigarettes are high in acidic flue-cured ("bright" or "Virginia") tobacco, the smoke tends to be smoothly acidic and nicotine exists primarily in the protonated/bound form. Cigar smoke, on the other hand, is alkaline and thus is more "harsh" and difficult to inhale but readily delivers unprotonated/freebase nicotine through the mouth.

30.    Route of administration and speed of delivery are key to understanding nicotine's addictive potential. According to the eminent nicotine researcher Dr. Neal Benowitz—Scientific Editor of the 1988 Surgeon General's Report on nicotine addiction: "After a puff, high levels of nicotine reach the brain in 10–20 s[econds], faster than with intravenous administration, producing rapid behavioral reinforcement. The rapidity of rise in nicotine levels permits the smoker to titrate the level of nicotine and related effects during smoking, and makes smoking the most reinforcing and dependence-producing form of nicotine administration."[18]

31.    After rapid delivery to the brain, nicotine binds to high-affinity nicotinic cholinergic receptors. Binding increases over time in smokers (and vapers) because the number of receptors actually increases as nicotine exposure increases. Again, according to Dr. Benowitz, "The rapid rate of delivery of nicotine by smoking … results in high levels of nicotine in the central nervous system with little time for development of tolerance. The result is a more intense pharmacologic action. The short time interval between puffing and nicotine entering the brain also allows the smoker to titrate

---

[18] Benowitz, *et al.,* Nicotine Chemistry, Metabolism, Kinetics and Biomarkers, *Handb Exp Pharmacol* (192): 29-60 (Oct. 13, 2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2953858/.

the dose of nicotine to a desired pharmacologic effect [often subconsciously], further reinforcing drug self-administration and facilitating the development of addiction."[19]

32.     Kids are particularly vulnerable to nicotine addiction, which is precisely why they have been targeted by Big Tobacco and now by JUUL. As described by the Surgeon General of the United States, "Tobacco use is a pediatric epidemic." Nine out of ten smokers begin by age 18 and 80% who begin as teens will smoke into adulthood.[20]

33.     According to the Surgeon General's Advisory on E-Cigarette Use among Youth: "Nicotine exposure during adolescence can harm the developing brain – which continues to develop until about age 25. Nicotine exposure during adolescence can impact learning, memory, and attention. Using nicotine in adolescence can also increase risk for future addiction to other drugs."[21]

34.     Of course, the cigarette industry was well aware of nicotine's addictive power, which it euphemistically referred to as "satisfaction" (a term, not ironically, that appears repeatedly in JUUL's '895 patent, as discussed below). As Lorillard's H.J. Minnemeyer put it, "Tobacco scientists know that physiological satisfaction is almost totally related to nicotine intake."[22]   R.J. Reynolds Director of Research, Claude Teague, likewise observed that "nicotine satisfaction is the dominant desire, as opposed to flavor and other satisfactions."[23]

35.     The tobacco industry was equally aware how important it was to snare kids before they aged beyond the window of opportunity. One memo from a Lorillard marketing manager to the

---

[19] *Id.*

[20] *Preventing Tobacco Use Among Youth and Adults*, *A Report of the Surgeon General* at 1 (2012), https://www.hhs.gov/surgeongeneral/reports-and-publications/tobacco/index.html.

[21] Surgeon General's Advisory on E-Cigarette Use Among Youth, https://e-cigarettes. surgeongeneral.gov/documents/surgeon-generals-advisory-on-e-cigarette-use-among-youth-2018.pdf.

[22] H.J. Minnemeyer, *Present Status of the Nicotine Enrichment Project* (internal Lorillard Tobacco Company memo) (April 13, 1977)

[23] Claude Teague, *A Gap in Present Cigarette Product Lines and an Opportunity to Market a New Type of Product*, (internal RJR memo) (March 28, 1972).

company's president put it most succinctly, "[t]he base of our business is the high school student."[24] It is no surprise, then, that in addition to youth marketing, the industry designed products specifically to attract and addict teen smokers. Claude Teague of R.J. Reynolds titled one internal memo "Research Planning Memorandum on Some Thoughts About New Brands of Cigarettes for the Youth Market." In it he frankly observed, "Realistically, if our Company is to survive and prosper, over the long term, we must get our share of the youth market. In my opinion this will require new brands tailored to the youth market."[25] Dr. Teague noted that "learning smokers" have a low tolerance for throat irritation so the smoke should be "as bland as possible," i.e., not harsh; and he specifically recommended an acidic smoke "by holding pH down, probably below 6." Noting that "pre-smokers" face "psychological pressure" to smoke if their peers are doing so, "a new brand aimed at a young smoker must somehow be the 'in' brand and its promotion should emphasize togetherness, belonging and group acceptance, while at the same time emphasizing 'doing one's own thing.'" As seen below, JUUL took a page from Dr. Teague's playbook.

36.    The danger nicotine poses to vaping youth is no less real than it was (and is) for young cigarette smokers. Again, according to the Surgeon General: "How does the nicotine in e-cigarettes affect the brain? Until about age 25, the brain is still growing. Each time a new memory is created, or a new skill is learned, stronger connections – or synapses – are built between brain cells. Young people's brains build synapses faster than adult brains. Because addiction is a form of learning, adolescents can get addicted more easily than adults."[26]

B.    **Traditional E-Cigarettes & Nicotine Delivery**

37.    An electronic cigarette is a battery-operated device typically comprised of a mouthpiece or cartridge, a tank or other repository for e-liquid ("juice"), a heating element, a

---

[24] T.L. Achey to Curtis Judge, *Product Information* (internal Lorillard Tobacco Company memo) (August 1978).

[25] Claude Teague, *Research Planning Memorandum on Some Thoughts About New Brands of Cigarettes for the Youth Market*, (internal RJR memo) (Feb. 2, 1973).
[26] *Know The Risks E-Cigarettes & Young People*, https://e-cigarettes.surgeongeneral.gov/knowtherisks.html#addiction.

rechargeable battery, and electronic circuits. As the user sucks on the mouthpiece, a sensor activates a heating element that vaporizes the juice, which is a flavored carrier for nicotine—typically comprised of propylene glycol, glycerol, or a combination of the two. JUUL e-liquid also contains solvents and chemical additives including flavorings.

38.     Like the smoke aerosol delivered by combustion cigarettes, the vapor aerosol delivered by e-cigarettes exists in two phases—a particulate phase and a gas or vapor phase.

39.     Because e-cigarette vapor does not contain many (or as many) of the mutagenic/carcinogenic byproducts generated through pyrolysis and combustion of tobacco leaf, e-cigarettes are widely thought to deliver a far less carcinogenic load when inhaled, though few would describe them as "safe."

40.     Most importantly, e-cigarettes are capable of delivering nicotine. When the juice is vaporized and inhaled, nicotine is carried on aerosol droplets or it is delivered as a gas or vapor. Freebase nicotine generally is taken up in the oral cavity, resulting in what Big Tobacco termed a "catch" or nicotine "hit" in the mouth and throat. The more acidic protonated form of nicotine passes through the oral cavity and is taken up in the lungs, resulting in rapid delivery to the brain.

41.     In short, the gross mechanics of nicotine delivery vary little between cigarettes and e-cigarettes.

42.     Given the similar mechanisms of nicotine delivery between e-cigarettes and conventional combustion cigarettes, much of the public health community has encouraged their use as smoking cessation aids and, accordingly, e-cigarettes historically have been marketed as an alternative to satisfy a nicotine addiction without exposure to tobacco smoke and the thousands of toxicants it contains.

1

### C.    JUUL Changes the E-Cigarette Landscape

2      43.    Seemingly celebrating its enhanced ability to deliver nicotine and deliver it quickly, the

3    primary JUUL '895 patent explains why JUUL is different from its competitors and why it delivers

4    more "satisfaction," which, when coupled with its marketing, explains its meteoric rise.[27]

5      44.    Before JUUL came to market, the vast majority of e-cigarettes delivered an alkaline

6    aerosol, meaning that nicotine was delivered largely in its freebase form through the membranes of

7    the mouth and throat. This alkaline vapor also had a perceived "harshness." This probably was not

8    unwelcomed to seasoned cigarette smokers who were trying to quit smoking, but it could deter

9    "learners," as Claude Teague at R.J. Reynolds noted with respect to cigarettes more than 40 years

10   before JUUL was introduced.

11     45.    A more acidic vapor would be less harsh, and therefore less intimidating to starting

12   vapers, while also permitting a virtually unlimited number of puffs as it would be impossible to

13   "oversmoke" such a mild vapor, which would prove particularly dangerous and deceptive given that

14   this "smooth" vapor actually delivered more nicotine than any other device on the market under

15   controlled conditions and, indeed, delivered nicotine more efficiently than a combustion cigarette

16   according to Defendants' own patent.

17     46.    Before JUUL, no e-cigarette could achieve nicotine delivery that rivaled a combustion

18   cigarette (measured by peak plasma nicotine concentration ($C_{max}$)); nor could any e-cigarette deliver

19   nicotine as quickly (measured by the time to peak concentration ($T_{max}$)). JUUL's '895 patent all but

20   brags that it surpassed a commercially available combustion cigarette (Pall Mall) in maximum delivery

21   and nearly rivaled it in how soon it delivers peak nicotine.

22

23

24

25

26   [27] U.S. Patent 9,215,895 B2 (Dec. 22, 2015) ('895 Patent). "In accordance with Section 287(a) of
     Title 35 of the United States Code…, notice is hereby given that JUUL Labs, Inc.'s products are
27   protected by a variety of intellectual property rights including issued …., details of which are
     provided below: JUUL® BRAND ELECTRONIC NICOTINE DELIVERY SYSTEMS: **US9215895**,
28   ….," https://www.juul.com/intellectual-property-list (emphasis added).

47.    According to the patent, "certain nicotine salt formulations [i.e., JUUL's] provide *satisfaction* in an individual superior to that of free base nicotine, and more comparable to the *satisfaction* in an individual smoking a traditional cigarette."[28]

48.    This is understandable given that JUUL's optimum nicotine deliveries ("rate of nicotine uptake in the blood") are higher "than for other nicotine salt formulations aerosolized by an electronic cigarette ... and likewise higher than nicotine freebase formulations, while the peak nicotine concentration in the blood and total amount of nicotine delivered appears comparable to a traditional cigarette."[29] In other words, JUUL distinguishes itself, and established its patentability, by reference to its superlative ability to optimally deliver nicotine, both in terms of peak blood concentration and total nicotine delivery which is, in essence, to distinguish itself based on its extraordinary potential to addict.

49.    Not only is JUUL "comparable to a traditional cigarette," but according to the patent it excels: "[T]he rate of nicotine uptake in the plasma of blood of users is higher in certain nicotine salt formulations than that of the traditional cigarette" and those that "demonstrate the quickest rate of nicotine uptake in the plasma were more equivalent to cigarette satisfaction than the nicotine salt formulations showing the slowest rates of rise of nicotine in the subjects' blood plasma." Translated, "certain formulations" under patent (including 4% benzoic acid) had higher rates of nicotine uptake than a combustion cigarette, equating to high levels of "satisfaction" on subjective inquiry. JUUL included a graph in its patent depicting this success. It shows that 4% benzoate (among others) excels over a traditional commercially available Pall Mall cigarette in $C_{max}$ and rivals it in $T_{max}$. When JUUL went to market, it increased the nicotine content 25% as compared to the formulation tested for the patent (from 4% to 5% by weight, according to the label); presumably the graph would reflect this dramatic increase in nicotine content had JUUL employed the nicotine concentration at which it eventually was sold:

---

[28] '895 Patent at 7:51-55 (emphasis added).

[29] *Id.* at 7:63-8:4.



50.    JUUL's '895 patent also included a table (Table 1) reflecting the amounts of nicotine detected, including $C_{max}$, $T_{max}$ and Area Under the Curve (AUC), which is a standard pharmacokinetic measurement reflecting the actual body exposure to a drug after administration. JUUL exceeded the combustion cigarette Pall Mall in every measure except $T_{max}$ (time to peak blood concentration of nicotine), where it lagged by only about 10 seconds; again, keeping in mind the version of JUUL that went to market had at least 25% more nicotine than the formulation reported in the patent:

| TABLE 1 | | | |
|---|---|---|---|
| Time | Pall Mall | 2% Freebase | 2% Benzoate | 4% Benzoate |
| −2 | 0.46 | 0.03 | 0.09 | 0.05 |
| 0 | −0.46 | −0.03 | −0.09 | −0.05 |
| 1.5 | 1.54 | 0.08 | 5.67 | 6.02 |
| 3 | 9.98 | 1.19 | 8.60 | 11.47 |
| 5 | 11.65 | 1.70 | 11.44 | 15.06 |
| 7.5 | 11.34 | 3.09 | 6.43 | 12.12 |
| 10 | 9.24 | 3.42 | 5.03 | 11.08 |
| 12.5 | 8.85 | 3.35 | 4.68 | 10.10 |
| 15 | 8.40 | 2.81 | 4.47 | 8.57 |
| 30 | 5.51 | 1.74 | 2.72 | 5.56 |
| 60 | 3.39 | 0.79 | 1.19 | 3.60 |
| $T_{max}$ (min) | 5.17 | 10.00 | 6.67 | 5.83 |
| $C_{max}$ (ng/mL) | 11.65 | 3.42 | 11.44 | 15.06 |
| AUC (ng * min/mL) | 367.5 | 106.2 | 207.8 | 400.2 |

51. According to the Defendants, JUUL pods contain flavorings and 0.7ml e-liquid with 5% nicotine by weight, which they claim to be an amount of nicotine equal to a pack of cigarettes (20 cigarettes), or 200 puffs.[30]

52. It is false and misleading because the nicotine content of one JUUL pod actually equates to 34-38.5 cigarettes (more than a pack-and-a-half). One ml of 24 mg/ml e-liquid "corresponds to one pack of cigarettes."[31] JUUL contains between 59-66 mg/ml of nicotine.[32] At 59 mg/ml JUUL's e-liquid is 2.46 times stronger than an e-liquid at 24 mg/ml. Thus, one ml of JUUL e-liquid would be equivalent to 2.46 packs of cigarettes. However, a JUUL pod contains 0.7 ml of e-liquid (rather than one ml), so it is equivalent to 1.72 packs of cigarettes (2.46 x 0.7), which is 34.4 cigarettes. At 66 mg/ml of nicotine, a JUUL pod would contains as much nicotine as 38.5 cigarettes, just shy of two packs (40 cigarettes).

53. This representation also is false and misleading because it implies that the amount of nicotine *delivered* in one JUUL pod would be equivalent to a pack of cigarettes but given JUUL's smooth, acidic vapor delivery, users are capable of "hitting" a JUUL device far more frequently than a normal person could tolerate with a conventional combustion cigarette; and this would be particularly true for adolescents unfamiliar with daily cigarette smoking.

54. JUUL's astonishing nicotine concentrations, as compared to 183 other e-cigarettes, are depicted in a recent journal article, where blue dots represent the nicotine concentrations 181 other

---

[30] Truth Initiative, *6 important facts about* JUUL, (April 20, 2018), https://truthinitiative.org/news/6-important-facts-about-juul.

[31] Pulvers, et al, Tobacco Consumption and Toxicant Exposure of Cigarette Smokers Using Electronic Cigarettes, *Nicotine & Tobacco Research*, 2018, 206-214.

[32] Omaiye, E., et al, High-Nicotine Electronic Cigarette Products: Toxicity of JUUL Fluids and Aerosols Corrlelates Strongly with Nicotine and Some Flavor Chemical Concentrations, *Chem. Res. Toxicol.* 2019, 32, 1058-1069 (2019). *See also* Pankow, J., et al., Benzene formation in electronic cigarettes, (2017) PLoS ONE: 12(3):e0173055 (reporting 61.6 mg/ml of nicotine in JUUL).

products, green dots represent nicotine concentrations in R.J. Reynolds' Vuse product, and the red dots

represent JUUL's nicotine concentrations:[33]



55.     Nicotine is not a selling point to youth—it is the secret weapon. The reported 5%

nicotine by volume in a JUUL pod provides more than twice the concentration of nicotine in similar

e-cigarette devices, thereby underplaying the real amount of nicotine being delivered in an average

smoking session.

56.     In addition to its sheer volume of nicotine, the JUUL also is more efficient at delivering

that nicotine into the bloodstream than other electronic cigarettes. As noted above, other brands use a

chemically modified form of nicotine called freebase nicotine. JUUL uses nicotine salts that more

closely resemble the natural structure of nicotine found in tobacco leaves. This makes the nicotine

---

[33] Omaiye, E., et al, High-Nicotine Electronic Cigarette Products: Toxicity of JUUL Fluids and Aerosols Corrlelates Strongly with Nicotine and Some Flavor Chemical Concentrations, *Chem. Res. Toxicol.* 2019, 32, 1058-1069 (2019).

more absorbable while at the same time making the vapor less harsh, thereby enabling the user to inhale more nicotine for longer periods.[34]

57.    JUUL pods also contain a significant amount of benzoic acid, 44.8 mg/ml, as compared to other e-cigarette brands that use nicotine salts.[35] Using benzoic acid allows a higher volume of nicotine salts to be absorbed at a much quicker rate than other e-cigarettes by lowering the pH levels and enabling a smoother vaping experience: "Essentially, [JUUL] shot down two birds with a single stone, creating one of the strongest e-liquids that can be enjoyed without suffering cough fits."[36] This is corroborated by JUUL's own '895 patent, as discussed above which, again, tested nicotine delivery using a product containing 20% less nicotine than commercially available JUUL.

58.    Before JUUL was introduced in 2015, the most popular e-cigarette products contained nicotine strengths between 1 percent and 2.4 percent. JUUL's pods debuted at 5 percent nicotine strength (according to JUUL; independent researchers have detected higher values).

59.    Most young people are not aware that they are consuming nicotine when they use e-cigarettes, much less how much nicotine they are ingesting. Results from an April 2018 Truth Initiative study showed that nearly two-thirds of JUUL users between 15 and 24 years of age did not know that the product always contains nicotine. The study provides further evidence that young people are unaware of the nicotine they are consuming, and the majority of youth e-cigarette users think they vape only flavoring, not nicotine.[37]

60.    "The nicotine concentrations are sufficiently high to be cytotoxic, or toxic to living cells, when tested in vitro with cultured respiratory system cells," said Prue Talbot, a professor in the

---

[34] NIH National Cancer Institute, *Vaping pods Produce High Nicotine Levels in Young Users,* (Oct. 5, 2018), https://www.cancer.gov/news-events/cancer-currents-blog/2018/youth-vaping-high-nicotine-levels.

[35] Pankow, J., et al., Benzene formation in electronic cigarettes, (2017) PLoS ONE: 12(3):e0173055.

[36] Vaping Daily, *Nicotine Salts – A Big, Fat Fad or The Next Hit Thing?,* https://vapingdaily.com/what-is-vaping/nicotine-salts/

[37] Daily Caller, *Did Juul Build Its E-Cigarette Empire By Marketing To Teens?,* (November 20, 2018), https://dailycaller.com/2018/11/20/juul-marketing-minors-e-cigarettes/.

Department of Molecular, Cell and Systems Biology at the University of California, Riverside, who found that nicotine concentrations are higher in JUUL electronic cigarettes than in any of the hundreds of other electronic cigarette products the team analyzed.[38] "JUUL is the only electronic cigarette product we found with nicotine concentrations high enough to be toxic in standard cytotoxicity tests. A big concern is that its use will addict a new generation of adolescents to nicotine."[39]

**D.     The Dangers of E-Cigarettes**

61.     The principal difference between a traditional cigarette and an e-cigarette is that the latter does not contain tobacco. Although e-cigarettes may reduce exposure to some of the toxic chemicals found in conventional tobacco cigarettes, they nevertheless delivery a myriad of other toxins—such as acrolein, acetaldehyde and formaldehyde—along with a continued exposure to nicotine and its high addiction potential.[40]

62.     It is not only the tobacco in cigarettes that causes cancer. Conventional cigarettes contain a host of chemicals that have been proven harmful to health, many of which are present in e-cigarettes.[41] In fact, a preliminary study presented at the 2018 annual meeting of the American Chemical Society found that vaping could damage DNA.[42] The study found three DNA-damaging compounds—formaldehyde, acrolein and methylglyoxal—whose levels increased in the saliva after vaping. Compared with people who do not vape, four of the five e-cigarette users showed increased DNA damage related to acrolein exposure. The type of damage, called a DNA adduct, occurs when

---

[38] Medical Express, *JUUL electronic cigarette products linked to cellular damage* (April 9, 2019), https://medicalxpress.com/news/2019-04-juul-electronic-cigarette-products-linked.html.

[39] *Id.*

[40] Walley SC, *et al.*, *Section on Tobacco Control. Electronic nicotine delivery systems*, Pediatrics 2015 Nov;136(5):1018-26. doi: 10.1542/peds.2015-3222, https://www.ncbi.nlm.nih.gov/pubmed/26504128.

[41] France de Bravo, B. *et al., Is Vaping Safer than Smoking Cigarettes?,* National Center for Health Research, http://www.center4research.org/vaping-safer-smoking-cigarettes-2/

[42] *E-cigarettes can damage DNA*, Medical Xpress (August 20, 2018), available at https://medicalxpress.com/news/2018-08-e-cigarettes-dna.html (last visited July 17, 2019)

toxic chemicals, such as acrolein, react with DNA. If the cell does not repair the damage so that normal DNA replication can take place, cancer could result. *Id.* These findings are consistent with those of the FDA, which since 2009 has warned that e-cigarettes contain "detectable levels of known carcinogens and toxic chemicals to which users could be exposed."[43]

63.    Likewise, chemical flavorings such as vanillin (an aldehyde) react with the propylene glycol in JUUL's e-liquid to form acetals, which "activate pro-inflammatory irritant receptors" and may thereby "cause irritation and contribute to inflammatory responses." While chronic inhalational exposure to vanillin in occupational environments is capped at 10 mg/m$^3$, the average vanillin puff concentration in JUUL is ten times that amount (101 mg/m$^3$).[44]

64.    In a comprehensive survey of existing literature, the National Academies of Science, Engineering & Medicine concluded in 2018, among other things, that:

- "There is conclusive evidence that in addition to nicotine, most e-cigarette products contain and emit numerous potentially toxic substances."[45]

- "There is substantial evidence that some chemicals present in e-cigarette aerosols (e.g., formaldehyde and acrolein) are capable of causing DNA damage and mutagenesis," supporting "the biological plausibility that long-term exposure to e-cigarette aerosols could increase the risk of cancer and adverse reproductive outcomes."[46]

---

[43] FDA, *Summary of Results: Laboratory Analysis of Electronic Cigarettes Conducted By FDA*, FDA News & Events (July 22, 2009), https://www.scirp.org/(S(i43dyn45teexjx455qlt3d2q))/reference/ReferencesPapers.aspx?ReferenceID=1560557.

[44] Erythropel, H., et al. Flavorant-Solvent Reaction Products and Menthol in JUUL E-Cigarettes and Aerosol, *Am. J. Prev. Med.* 2019; 000(0000):1-3 (in press).

[45] National Academies of Sciences, Engineering, and Medicine, *Public Health Consequences of E-Cigarettes* (Jan. 23, 2018) at 198, http://nationalacademies.org/hmd/Reports/2018/public-health-consequences-of-e-cigarettes.aspx.

[46] *Id.* at 401.

- "There is substantial evidence that e-cigarette aerosols can induce acute endothelial cell dysfunction...."[47]

65. Chronic inflammation may lead to diseases like bronchitis, emphysema, and heart disease. Indeed, a recent study based on survey results of 66,795 e-cigarette users (and 343,856 non-user controls) concluded that, compared to non-users, e-cigarette users have a 71 percent higher risk of stroke; a 59% higher risk of heart attack or angina; a 40% higher risk of coronary heart disease; and double the rate of cigarette smoking, which itself carries a whole host of additional risks. The addictive quality of e-cigarettes—with JUUL leading the pack—ensures compulsive use of the products and continued increased risk for suffering these maladies. Because e-cigarette aerosols contain many of the same toxic chemicals, there is no reason to believe that they will significantly reduce the risks for these diseases.[48] Side effects of inhaling vaporized nicotine include insulin resistance, leading to type 2 diabetes from chronic nicotine exposure; suppressed appetite; increased heart rate and blood pressure; lung disease; chronic bronchitis; and most notably impairment of prefrontal brain development in adolescents.

66. The American Heart Association (AHA) cautions against the use of e-cigarettes, stating that e-cigarettes containing nicotine are tobacco products that should be subject to all laws that apply to these products.[49] AHA studies found that e-cigarette use resulted in: 71% higher risk of stroke; 59% higher risk of heart attack or angina; and a 40% higher risk of coronary heart disease. *Id.*

### E. E-Cigarettes Are Particularly Dangerous To the Youth Population

---

[47] *Id.* at 7.

[48] Medical Express, *E-cigarettes linked to higher risk of stroke, heart attack, diseased arteries* (Jan. 30, 2019), https://medicalxpress.com/news/2019-01-e-cigarettes-linked-higher-heart-diseased.html

[49] *Id.*

67.    As the pioneer tobacco researcher Michael Russell said in 1971, "were it not for the nicotine in tobacco smoke, people would be little more inclined to smoke than they are to blow bubbles or light sparklers."[50]  The same is true for e-cigarettes.

68.    JUUL confers no benefit upon the user aside from the novelty of "blowing smoke." Like all novelties, that would wane quickly but for JUUL's propensity to addict. JUUL's sole purpose is to deliver nicotine to its user. The sole purpose for including nicotine in a product marketed to adolescents is to addict them.

69.    Nicotine and other compounds delivered in JUUL's aerosol present unacceptable danger to youth, most of whom have not used tobacco products before.

70.    In 2016, the American Academy of Pediatrics issued a comprehensive report, *Nicotine and Tobacco as Substances of Abuse in Children and Adolescents*, reconfirming that nicotine is an extremely addictive substance to which the rapidly developing brains of children are particularly susceptible, and that long-term exposure is linked with heart disease, an increased risk of stroke, oral, esophageal, and pancreatic cancer, osteoporosis and infertility. [51] Children are especially likely to become nicotine dependent, and the younger a child is when first experimenting with smoking, the likelier it is that he or she will become addicted. The Report noted that an estimated two-thirds of kids who smoke in sixth grade become regular smokers by adulthood and that ninety percent of adult smokers started smoking before the age of 18.

71.    Separate studies have also found that adolescents who started smoking at a young age had markedly reduced activity in the prefrontal cortex of the brain, an area critical for a person's cognitive behavior and decision-making, leading to increased sensitivity to other drugs and greater

---

[50] Robert N. Proctor, *The Golden Holocaust* (Univ. of Cal. Press 2011).

[51] Siqueira LM., *Nicotine and Tobacco as Substances of Abuse in Children and Adolescents,* Pediatrics. 2017 Jan;139(1). pii: e20163436. doi: 10.1542/peds.2016-3436, https://www.ncbi.nlm.nih.gov/pubmed/27994114.

1  impulsivity.[52] Unsurprisingly, those who use e-cigarettes are more than four times as likely as non-

2  vapers to start smoking traditional cigarettes within 18 months.[53]

3      72.    E-cigarette use is rampant among adolescents and young persons and use decreases

4  with age.[54] By 2016, over two million middle and high school students had tried e-cigarettes. For those

5  aged 18 to 24 years, 40 percent of vapers had not been smokers before using the device.[55]

6      73.    JUUL claims its products are for adult smokers but, in fact, fewer than four percent of

7  U.S. adults use e-cigarettes while *current* use among high school students is at 20.8% and rising.

8  **V.    FACTUAL ALLEGATIONS – JUUL**

9      74.    JUUL's predecessor—Pax—was a moderately successful vaping company mostly

10  known for its loose-leaf cannabis vaporizers. By 2015, it had developed ambitions to enter the highly

11  profitable, albeit significantly saturated, e-cigarette market then dominated by Big Tobacco

12  companies. While the barriers to entry were relatively low, JUUL knew it could not compete with the

13  marketing budgets of the Big Tobacco companies.

14      75.    As explained by Pax Labs CEO James Monsees in a 2015 interview with *Wired*

15  magazine, "[s]ince there's very little protective intellectual property and very little regulation, anyone

16  and everyone can get in the e-cig market. All you have to do is have a phone call to one of the six

17  manufacturers or so in China that are producing these e-cigarettes…and you're in the e-cig business."[56]

18

19  [52] Musso F *et al.*, *Smoking impacts on prefrontal attentional network function in young adult brains*,
20  Psychopharmacology (Berl). 2007 Mar;191(1):159-69. Epub 2006,
   https://www.ncbi.nlm.nih.gov/pubmed/16937098.

21  [53] Vallone, D. *et al.*, *Prevalence and correlates of JUUL use among a national sample of youth and
22  young adults*, Tobacco Control (Oct. 30, 2018),
   https://tobaccocontrol.bmj.com/content/early/2018/10/30/tobaccocontrol-2018-054693.

23  [54] National Academies of Sciences, Engineering, and Medicine, *Public Health Consequences of E-
24  Cigarettes* (Jan. 23, 2018), http://nationalacademies.org/hmd/Reports/2018/public-health-
   consequences-of-e-cigarettes.aspx.

25  [55] Brazier, Y., *Are e-cigarettes a safe alternative to smoking?*, Medical News Today (June 25, 2018),
26  https://www.medicalnewstoday.com/articles/216550.php (last visited January 21, 2019).

27  [56] Wired, *This Might Just Be The First Great E-Cig* (April 21, 2015), https://www.wired.com/
28  2015/04/pax-juul-ecig/.

Even if Pax made the best e-cigarette on the planet, the more difficult proposition, Monsees admitted, was that Pax could not compete with the marketing spends that enabled products like Blu and NJOY to advertise in the Sports Illustrated swimsuit issue and the Super Bowl. *Id.*

76.    To succeed, JUUL needed an angle. Taking from the successes of Big Tobacco, JUUL turned its marketing eye toward the youth—a new generation of potential smokers who were not focused on quitting, but on doing things to be 'cool.' "It's just objectively cool," said Ari Atkins, an R&D engineer at Pax. "How do you make somebody look cooler? Give them a cigarette." *Id.*

77.    The JUUL e-cigarette presented a sleek design that was simple to use, easy to hide, cool to smoke, highly addictive, and marketed to a population that was primed to receive that message—young people. The strategy was not new, but it was effective and remains as deceptive, misleading and illegal as when it was employed by tobacco companies decades ago.

> "The younger smoker is of pre-eminent importance. Evidence is now available to indicate that the 14-18-year-old group is an increasing segment of the smoking population. [We][] must soon establish a successful new brand in this market if our position in the industry is to be maintained over the long term."[57]

> The 14-24 age group, "represent tomorrow's cigarette business. As this 14-24 age group matures, they will account for a key share of the total cigarette volume – for at least the next 25 years ...Thus our advertising strategy becomes clear...[d]irect advertising appeal to the younger smokers ..."[58]

78.    JUUL combined a youth-oriented design that delivers an extreme nicotine dose; then they marketed it to youth. In just three years they have dominated the market and ushered in a foreseeable and unconscionable youth vaping epidemic.

---

[57] RJR, *Planning Assumptions and Forecasts for the period 1976-1986,* https://www.who.int/tobacco/media/en/TobaccoExplained.pdf).

[58] RJR, *Key Opportunity Areas* (1975), htttps://www.who.int/tobacco/media/en/TobaccoExplained.pdf.

**A.    Youth–Oriented Design and Kid–Friendly Flavors**

79.    JUUL looks like a USB memory stick. The company explained the name as connoting a "jewel" (something precious) and "joule" (a unit of energy). It has been called the "iPhone of e-cigarettes" to which even the packaging bears a close resemblance.[59]

80.    The JUUL product consists of a rectangular enclosure containing a rechargeable battery and heating element and a pre-filled pod of JUUL's flavored nicotine solution that slides into the end of the JUUL unit. When a sensor in the JUUL detects the movement of air caused by suction, the battery activates the heating element, which converts the pod liquid into an easily inhaled aerosol. The JUUL has no settings or controls making it simple to use.  Indeed, "one of the reasons it is so popular among youth is that it is so easy to use – no prior experience or knowledge required. All they have to do to intake nicotine is to put a JUUL to their mouth and inhale."[60]



https://californiahealthline.org/news/the-juuls-so-cool-kids-smoke-it-in-school/

---

[59] Jackler, *JUUL Advertising (2015 – 2018)* at 2.

[60] Fraga, JA, *The Dangers of Juuling*, National Center for Health Research, http://www.center4research.org/the-dangers-of-juuling/.

81.     Every aspect of the JUUL was designed with youth appeal in mind. For example, if you wave the JUUL around, it lights up in a rainbow of colors. As James Monsees, JUUL's Chief Product Officer points out, this feature is, "completely pointless. But it's fun."[61]

82.     JUUL users had the ability to customize the appearance of the device with unique colors and patterns—an appealing way for younger users to disguise their devices as well as express themselves.[62]

  

83.     Because the JUUL closely resembles a USB drive, it can easily be hidden and used in a wide variety of settings, such as the classroom or school restroom, making it even more attractive to youth. "Teachers and school administrators across the nation are finding students JUULing when their backs are turned: Students can take a hit, blow the small, odorless puff of smoke into their jacket or backpack, and continue their school-work in a matter of seconds."[63]

---

[61] Pierce, D., *THIS MIGHT JUST BE THE FIRST GREAT E-CIG*, Wired (April 21, 2015), https://www.wired.com/2015/04/pax-juul-ecig/.

[62] *Pop Culture Collection Skin Compatible With JUUL*, https://mightyskins.com/collections/pax-juul-skins/products/paxjuul-par-pop-culture?variant=13841933107259.

[63] NBC News, *Why JUULing has become a nightmare for school administrators*, March 26, 2018, https://www.nbcnews.com/health/kids-health/why-juuling-has-become-nightmare-school-administrators-n860106.


64


65

84. As reported in California Healthline, March 19, 2018,

> The students wait eagerly for their teachers to turn their backs. That's their cue to
> reach quietly for a small, sleek device they can easily conceal in their palms. It
> resembles a flash drive, but instead of computer files, this device stores nicotine.
> They take a hit, sucking on the device as they would a cigarette. Then, "they blow
> into their backpacks … or into their sweater when the teacher isn't looking," said
> Elijah Luna, 16, a sophomore at Vista del Lago High School in Folsom, Calif.,
> The vapor cloud is so small and dissipates so quickly that teachers are usually

---

64 *Id.*

65 USA Today, *Juuling is popular with teens, but doctor sees a 'good chance' that it leads to smoking*, (October 31, 2017), https://www.usatoday.com/story/money/nation-now/2017/10/31/juul-e-cigs-controversial-vaping-device-popular-school-campuses/818325001/.

none the wiser....Although its manufacturer, Juul Labs, said the device is intended exclusively for adult use, it is appealing to youth because it can be easily charged on a laptop, its decal covers come in colorful designs, and the pods are available in flavors such as mango, mint and crème brûlée....The odor Juuls produce is subtle and could easily be mistaken for a lotion or body spray.[66]

85.     In addition to the look and feel of the JUUL device, JUUL marketed its liquid pods in a variety of bright colors and flavors attractive to kids, such as mango, cucumber, fruit, and crème brulee. Data from the 2016-2017 wave of the FDA's Population Assessment of Tobacco and Health study found that 96.1 percent of 12-17 year–olds who had initiated e-cigarette use since the last survey wave started with a flavored product. Additionally, it found that 97 percent of current youth e-cigarette users had used a flavored e-cigarette in the past month and 70.3 percent say they use e-cigarettes "because they come in flavors I like."[67] According to a survey conducted by the Public Health Law Center, among under-age JUUL users, the vast majority preferred and consumed flavored pods over all other offerings.[68]

86.     JUUL flavors clearly have a "youthful orientation" and "differential appeal to youth."[69] And any doubt to the contrary is quickly dispelled by a sampling of JUUL's patented developmental flavors (e.g. peanut and jam, classic dessert, cinnamon snap) which sound more like a selection of ice creams than nicotine.[70] Indeed, JUUL's child-friendly flavoring was an integral part of their marketing scheme. "Youth e-cigarette users cite flavors as a main reason they begin using e-cigarettes. A study

---

[66] Ibarra, A., *The Juul's So Cool, Kids Smoke It In School*, California Healthline (March 19, 2018) https://californiahealthline.org/news/the-juuls-so-cool-kids-smoke-it-in-school/.

[67] FDA, *Modifications to Compliance Policy for Certain Deemed Products: Guidance for Industry, Draft Guidance* (March 13, 2019), https://www.fda.gov/downloads/TobaccoProducts/Labeling/RulesRegulationsGuidance/UCM633281 .pdf.

[68] Public Health Law Center, W*hat's the Hype? JUUL Electronic Cigarette's Popularity with Youth a& Young Adults*, April 26, 2018, https://www.publichealthlawcenter.org/sites/default/files/JUUL-Webinar-Slides-Apr262018.pdf.

[69] Jackler, *JUUL Advertising (2015 – 2018)* at 34-35.

[70] *Id.*

that included middle and high school students found that 43 percent of young people who ever used e-cigarettes tried them because of appealing flavors."[71]

**B.    JUUL's Nicotine Load**

87.    According to the Defendants, JUUL pods contain flavorings and 0.7ml e-liquid with 5% nicotine by weight, which they claim to be an amount of nicotine equal to a pack of cigarettes, or 200 puffs.[72] This representation is false and misleading because, as explained above, a JUUL pod's nicotine content is equivalent to 34-38.5 cigarettes (nearly two packs of cigarettes), and because it implies that a JUUL pod's nicotine delivery would be equivalent to one pack of cigarettes while, in truth, JUUL's unique formulation capitalizing on nicotine salts produces a smoother and milder aerosol that can be inhaled in greater quantities over a longer time than one could tolerate with combustion cigarettes, increasing the overall nicotine load as compared to a pack of cigarettes.[73]

88.    In addition to its sheer volume of nicotine, JUUL also is more efficient at delivering that nicotine into the bloodstream than other electronic or tobacco cigarettes. While JUUL's predecessors almost exclusively used freebase nicotine, JUUL uses nicotine salts. As a result, JUUL delivers higher peak nicotine than a Pall Mall cigarette (as JUUL itself depicts in its '895 patent) and it does so quickly.

89.    Additionally, JUUL's design facilitates a manner of clandestine use that is not feasible with combustion cigarettes. Not surprisingly, then, a recent study showed that after recent use, adolescent e-cigarette users had higher levels of nicotine than have been found previously in

---

[71] Truth Initiative, *4 Marketing Tactics E-Cigarette Companies Use To Target Youth* (August 9, 2018), https://truthinitiative.org/research-resources/tobacco-industry-marketing/4-marketing-tactics-e-cigarette-companies-use-target.

[72] Truth Initiative, *6 important facts about JUUL* (Aug. 20, 2018), https://truthinitiative.org/news/6-important-facts-about-juul. See also Checkup Newsroom, *Juul, Other E-Cigarettes Called an "Epidemic" by FDA Chief*, https://www.checkupnewsroom.com/juuling-new-vaping-method-exposes-teens-to-a-pack-a-day-of-cigarettes/ ("The nicotine cartridge inserted into the Juul gives about 200 puffs, about as much nicotine as a pack of cigarettes, according to the product's website.")

[73] *See supra* § IV.C.

adolescents who smoked conventional cigarettes.[74] In addition, the vaporization of nicotine salts tend to be less visible and odiferous than its freebase counterparts, enabling minors and youth to use it covertly while at school.

90.    Due JUUL's use of significant amounts of benzoic acid (44.8 mg/ml), as compared to other e-cigarette brands that use nicotine salts, JUUL facilitates relatively higher absorption at a faster rate than other e-cigarettes.[75]

91.    Before JUUL was introduced in 2015, the most popular e-cigarette products contained nicotine strengths between 1 percent and 2.4 percent. JUUL's pods debuted at 5 percent nicotine strength.

92.    Most young people are not aware that they are consuming nicotine when they use e-cigarettes, much less how much nicotine they are ingesting. Results from an April 2018 Truth Initiative study showed that nearly two-thirds—63 percent—of JUUL users between 15 and 24 years of age did not know that the product always contains nicotine. The study provides further evidence that young people are unaware of the nicotine they are consuming, and the majority of youth e-cigarette users think they vape only flavoring, not nicotine.[76]

93.    A scientific study analyzing the addictiveness of e-liquids in freebase and salt forms confirmed what youth vaping statistics had already shown—JUUL patented a highly addictive vaping product ideally suited for youth.

> E-liquids usually contain significant amount of nicotine, which exist primarily in two forms, freebase nicotine (unprotonated) and nicotine salts (monoprotonated). The protonation state of nicotine can be altered by changing the acid/base conditions in the medium. When dosed via aerosol, the two nicotine forms have different mechanisms and kinetics of delivery, as well as differing implications for harshness of the inhaled aerosol, so the nicotine free-base fraction $\alpha fb$ is

---

[74] NIH, National Cancer Institute, *Vaping Pods Produce High Nicotine Levels in Young Users* (Oct. 5, 2018), https://www.cancer.gov/news-events/cancer-currents-blog/2018/youth-vaping-high-nicotine-levels.

[75] Vaping Daily, *Nicotine Salts – A Big, Fat Fad or The Next Hit Thing?*, https://vapingdaily.com/what-is-vaping/nicotine-salts/.

[76] *Supra* n.40.

relevant regarding abuse liability.[77] E-liquids designed to combine high total nicotine level (addictive delivery) with low $\alpha_{fb}$ (for ease of inhalation) are likely to be particularly problematic for public health. "Of the products tested, only the JUUL liquids were found to combine high nicotine levels with low $\alpha_{fb}$ values..... [T]obacco company documents suggest that products with high nicotine levels but low $\alpha_{fb}$ such as JUUL will yield vape aerosols of much reduced harshness as compared to products with even only moderate nicotine levels. This may well contribute to the current use prevalence of JUUL products among youth."[78]

94.     JUUL's nicotine concentration is 59 mg/ml. However, in salt form the rate and efficiency of nicotine delivery are increased and, as seen in JUUL's '895 patent, delivery can exceed that of a traditional cigarette. A recent study of JUUL pods found that, "[t]he nicotine levels delivered by the JUUL are similar to or even higher than those delivered by cigarettes."[79] The study tested JUUL's Tobacco, Crème Brulee, Fruit Punch, and Mint flavors and found that a puff of JUUL delivered $164 \pm 41$ micrograms ($\mu g$) of nicotine. Reilly's findings were based on a puff volume of 75 ml. By comparison, a 2014 study using larger, 100 ml puffs found that a Marlboro cigarette delivered 152–193 $\mu g$/puff.[80] Correcting to account for the different puff sizes, the data demonstrate that JUUL delivers more nicotine per puff than a Marlboro, rendering JUUL's equivalency representation—that a single pod contains nicotine equivalent to approximately one pack of conventional cigarettes—false and misleading.[81]

---

[77] Motti, C., *Analyzing Free-Base Nicotine Content in the Particulate Matter of Mainstream Tobacco Smoke Using a Headpace Solid-Phase Microextraction GC/MS Method* (The nicotine free-base fraction ($\alpha fb$) is the fraction of nicotine that exists in the freebase form and is important when understanding the magnitude and rate of nicotine absorbed by a smoker). https://pdxscholar.library.pdx.edu/cgi/viewcontent.cgi?article=1015&context=cengin_gradprojects

[78] Duell, A., et al., *Free-Base Nicotine Determination in Electronic Cigarette Liquids by 1H NMR Spectroscopy*, Chem. Res. Toxicol. 2018 Jun 18; 31(6): 431–434, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6008736/.

[79] Reilly, S.M *et al.*, *Free Radical, Carbonyl, and Nicotine Levels Produced by JUUL Electronic Cigarettes*, Nicotine Tob. Res. 2018 Oct 20. doi: 10.1093/ntr/nty221, https://www.ncbi.nlm.nih.gov/pubmed/30346584.

[80] M.J. Schroeder, *et al.*, Electronic Cigarettes and Nicotine Clinical Pharmacology, Tobacco Control 2014; Suppl 2:ii30-5. doi: 10.1136/tobaccocontrol-2013-051469, https://www.ncbi.nlm.nih.gov/pubmed/24732160.

[81] *Supra* n.75.

95.     The real-world results are undeniable.

- Twelve-year-old Hannah Piedad first encountered vaping—an electronic form of smoking—at a New Year's party. It was the smell that got her attention. "I was intrigued because it smelled just like maple syrup," she said. "Imagine a whole generation of us, but addicted to nicotine. That is what's happening all across Kentucky right now," warned Emily Farler, 13.[82]

- Phillip Fuhrman, 15, first tried a Juul in the eighth grade. A friend offered it to him, and he "didn't really know what it was." Before long, it became a habit he couldn't shake. At his peak, he estimated, he was going through a pod roughly every day and a half. "The 5% thing, I've always seen since I started it -- on Juul packs and everything -- but I never knew what it was," Fuhrman said. "Five percent doesn't seem like that much, out of 100%."[83]

- For some young people who use the popular vaping device sold by Juul Labs Inc., "juuling" is a verb in its own right. Caleb Mintz, 17 years old, first tried Juul when he was 15, after he saw his friend holding the sleek device. "Hearing the word Juul instead of vape makes it sound a lot different," he said. "It did not look like your typical vape. Giving it a fancy name made it seem like it didn't have anything harmful in it." He said he saw friends become so addicted that they'd turn to cigarettes for a nicotine fix if their Juul wasn't in reach.[84]

- "It's seen as something that's addictive, but I don't know what I'm addicted to," said Sophia, now 22. "It's been marketed as something not damaging to our health at all."[85]

96.     As "Juuling" entered the youth lexicon, the Truth Initiative raised concerns that some users may not know what they are inhaling. The anti-tobacco group found 63 percent of JUUL users

---

[82] The Spokesman Review, *In tobacco state, students testify about youngsters' vaping* (Feb. 27, 2019), http://www.spokesman.com/stories/2019/feb/27/in-tobacco-state-students-testify-about-youngsters/

[83] Nedelman, M., et al., *Juul ramped up nicotine levels, and competitors followed, study says,* CNN (Feb. 7, 2019), https://www.cnn.com/2019/02/07/health/juul-nicotine-arms-race-study/index.html.

[84] Edney, A., *Teens Say They Don't Vape, They Juul, Making E-Cigarette Use Hard to Track,* Bloomberg (April 29, 2019), https://www.bloomberg.com/news/articles/2019-04-29/is-juul-vaping-new-e-cigarette-survey-asks-teens-for-first-time.

[85] *Id.*

ages 15 to 24 surveyed in November 2018 didn't know the product contains nicotine. [86] "During the last year and a half, we've been hearing a lot of anecdotes from kids who say, '[t]he first week I was using Juul, I did it because I thought it was cool. The second week I used Juul, I did it because I had to.'"[87]

## C.    JUUL's Advertising Campaign

97.    In 2015, JUUL was entering a crowded market dominated by well-funded Big Tobacco backed companies. Dollar for dollar, JUUL had little chance of breaking into this market.  So, it came up with a different strategy—a unique youthful brand identity, a highly addictive substance and a marketing campaign aimed at the most vulnerable of our population—our youth.

98.    Before launching their debut product, Defendants were well aware of the dangers that e-cigarettes posed and how addictive their product truly was, yet they actively hid these facts from consumers. Most importantly, Defendants knew that marketing and selling tobacco products to minors and youth was morally unconscionable and illegal.

99.    In addition to engineering the product to maximize its addictive potential, Defendants displayed a keen understanding of Generation Z marketing

### 1.    *Vaporized Campaign*

100.    Until JUUL's debut, e-cigarette marketing was primarily focused on helping existing smokers quit their dependence on tobacco, or more likely, assuage their nicotine addiction with a non-tobacco alternative. The clear focus, however, was on adult cigarette smokers. In 2015, JUUL launched its Vaporized Campaign, which purposely shifted the advertising paradigm from adult smokers to the uninitiated youth.

101.    JUUL's Vaporized campaign consisted of ads filled with attractive young models socializing, dancing, and flirtatiously sharing the flash-drive shaped device. The behavior depicted on

---

[86] CBS News, *Vaping has created teen nicotine addicts with few treatment options* (January 18, 2019), https://www.cbsnews.com/news/vaping-disturbing-trend-teens-few-options-for-addiction-treatment/.

[87] *Supra* n.40.

the advertisements was far more characteristic of teens than of mature adults. The ads, which depicted vaping as "cool", rarely referred to vaping as a tobacco alternative. JUUL's launch parties featured youth-oriented rock and pop bands and an unlimited supply of free samples. Defendants employed key social media techniques, such as broadly relatable hashtags that further extended their market reach and availed themselves to social media influencers to help foster peer-to-peer marketing among teens.[88] JUUL ran ads in Times Square and youth-oriented publications with imagery invoking adventurousness, sophistication, glamour and popularity, aimed at convincing young people who were not previously cigarette smokers to try JUUL products. JUUL employed the same advertising tactics that were used by Big Tobacco and ultimately prohibited. As Dr. Robert Jackler of Stanford's Research into the Impact of Tobacco Advertising project concluded, "[v]ery clearly, they do the same damn thing today as they did then. The messaging is very subtle, very carefully crafted but they target adolescents in the same way."[89]

102.    "These advertisements clearly resonated with a younger demographic, school age teens, which seek to emulate the cool and trendy look of playful twenty something models."[90]

103.    Ultimately, JUUL's marketing efforts were so successful that "juuling," (the act of smoking a JUUL), became a commonly used verb.[91]

---

[88] Chaykowski, K., The Disturbing Focus Of Juul's Early Marketing Campaigns, Forbes (Nov. 16, 2018),  https://www.forbes.com/sites/kathleenchaykowski/2018/11/16/the-disturbing-focus-of-juuls-early-marketing-campaigns/#68f6831d14f9.

[89] Keller, K., *Ads for E-Cigarettes Today Hearken Back to the Banned Tricks of Big Tobacco*, Smithsonian.com, April 11, 2018, https://www.smithsonianmag.com/history/electronic-cigarettes-millennial-appeal-ushers-next-generation-nicotine-addicts-180968747/.

[90] Jackler, *JUUL Advertising (2015-2018)* at 17.

[91] LaVito, A, *Popular e-cigarette Juul's sales have surged almost 800 percent over the past year*, CNBC (July 2, 2018), https://www.cnbc.com/2018/07/02/juul-e-cigarette-sales-have-surged-over-the-past-year.html







http://tobacco.stanford.edu/tobacco_main/subtheme_pods.php?token=fm_pods_mt068.php

104.    Over its first few years, the Vaporized campaigns and its successors fulfilled the aspirations of its creative agency (Cult Collective) to give the brand *"a cult-like following."* In so doing it, it pursued the path advocated by its creative Director Steven Baillie by aligning to: *"what is and will be buzzing in culture."[92]*

105.    The targeting of young consumers was evident in the design and implementation of the Vaporized campaign, which featured models in their 20s whose "poses were often evocative of behaviors more characteristic of underage teens than mature adults."[93]

106.    Cult Collective described their intention: "We created ridiculous enthusiasm for the hashtag "Vaporized," and deployed rich experiential activations and a brand sponsorship strategy that aligned perfectly with those we knew would be our best customers." Based upon subsequent sales trends, it is clear that this imagery resonated with underage teens who aspire to emulate these trendsetting young adults. The net effect of the initial campaign was to establish a notably youth-oriented brand identity for JUUL.[94]

    2.    *Launch Party*

107.    To launch the JUUL in 2015, the company decided not to pursue a conventional marketing campaign and instead threw "a really great party."[95]

108.    Between June 4 and December 8, 2015, JUUL threw 25 of these music/movie themed parties, the purpose of which was to introduce JUUL to the youth marketplace with fun, frolic and an endless supply of free samples.

---

[92] Creative Director Steven Baille, JUUL advertisements, Vimeo, https://vimeo.com/user32215494.

[93] Jackler, *JUUL Advertising (2015 – 2018)* at 7.

[94] *Id.*

[95] Brodwin, E, *Silicon Valley e-cig startup Juul 'threw a really great party' to launch its devices, which experts say deliberately targeted youth*, Business Insider (Sep. 4, 2018), https://www.businessinsider.com/juul-e-cig-startup-marketing-appealed-to-teens-2018-7

 

109.    The focus of these launch parties also was to get a group of youthful influencers to accept gifts of JUUL products, to try out their various flavors, and then to popularize their products among their peers. The events were always free and typically featured popular bands.[96]



**THE RESULTS:**
On average, BeCore exceeded the sampling goals set by JUUL for each location (average number of samples/event distributed equals 5,000+).

---

[96] Jackler, *JUUL Advertising (2015 – 2018)* at 6.



97

110.    At the launch parties, guests were encouraged to take photos and post them on social media accounts using the hashtag #LightsCameraVapor. JUUL also posted images from the parties on its social media accounts.

_____

97 http://ads.gawkerassets.com/creative/ads/live/Juul/Launch%20Party/carousel/carousel.html

3.    *Print Advertisements*

111.    JUUL's marketing campaigns were focused on a few principal advertising themes (pleasure/relaxation, socialization/romance, flavors, cost savings and discounts, holidays/seasons, style/identity, and satisfaction)—all of which were closely aligned with those traditionally used in tobacco advertising.[98]

112.    Knowing that its target demographic—Generation Z—was depended heavily on the internet and social media, JUUL generally avoided newspapers, billboards, radio, and television. It chose a single magazine, however, to launch its advertising campaign—*VICE* magazine, a glossy pop culture focused publication, which markets itself to advertisers as the "#1 youth media company."[99] It has been referred to as the "new teen bible."[100]

113.    While the advertisements were targeted at the young, the underlying tactics were developed years earlier by Big Tobacco. The Stanford University Research into the Impact of Tobacco Advertising ("SRITA"), which documented the entire line of JUUL advertising, includes more than 80 comparisons between JUUL and historical tobacco cigarette advertisements.[101] The outward similarities are undeniable, as are the results.

 

[98] Jackler, *JUUL Advertising (2015-2018)* at 9-10.

[99]  *Id. at 16.*

[100] https://www.independent.co.uk/news/media/the-vice-squad-how-vice-magazine-became-the-new-teen-bible-876351.html

[101] *Id.* at 27-33.










1

        **4.**    *Social Media & Influencers*

2

    114.   It is axiomatic that advertisers tailor their advertising to the media channels most

3 relevant to the age ranges they intend to target. Present-day middle and high school students,

4 Generation Z (born 1995 to 2012) have never experienced the world without the Internet and they are

5 immersed in social media, most often viewed on mobile phones.[102] They are technology driven, drawn

6 to entertaining interactions, and are easily swayed by messages that the company is committed to doing

7 good for humanity.[103]

8

    115.   It is no coincidence that JUUL's initial advertising did not include traditional media

9 channels such as radio or TV—the media preferences traditionally used to target baby boomers (1946-

10 1964) and Generation X (1965-1980).[104] Rather, JUUL chose to focus almost exclusively on social

11 media sites such as You Tube, Twitter, and Instagram (a video sharing platform that is the favorite

12 social media site among youth, used by 63% of teens age 13-14 and 78% of teens ages 15-17.5).[105]

13

    116.   A cornerstone of JUUL's social media marketing effort involved the recruitment and

14 use of influencers to increase brand awareness and promote sales. A June 2015 employment listing for

15 an Influencer Marketing Intern made JUUL's marketing strategy clear: "[t]*he Influencer Marketing*

16 *Intern will create and manage blogger, social media and celebrity influencer engagements. . . to build*

17

18

19

20

---

21

[102] Jenkins, R, *How Generation Z Uses Technology And Social Media*, https://blog.ryan-
22 jenkins.com/how-generation-z-uses-technology-and-social-media. (The top websites/apps used by
Generation Z are YouTube (91 percent), Gmail (75 percent), Snapchat (66 percent), Instagram (65
23 percent), and Facebook (61 percent)).

24 [103] Southgate D, *et al.*, *The Emergence of Generation Z and Its Impact in Advertising*, Advertising
Research 2017, 57:227-234, hhttp://www.journalofadvertisingresearch.com/content/57/2/227.article-
25 info

26 [104] *Boomers to Advertisers: Don't Forget About Us*. Morrissey J. Baby, New York Times, October
15, 2017, https://www.nytimes.com/2017/10/15/business/media/baby-boomers-marketing.html

27 [105] Anderson M, *et al.*, *Social Media & Technology*, , Pew Research Center, May 31, 2018,
28 https://www.pewinternet.org/2018/05/31/teens-social-media-technology-2018/.

*and nurture appropriate relationships with key influencers in order to drive positive commentary and recommendations through word of mouth and social media channels, etc.*"[106]

117.    According to Matthew Myers, the president of the nonprofit Campaign for Tobacco Free Kids, JUUL's decision to put the bulk of its ads on social media rather than magazines, billboards, or TV also meant that adults and federal regulators were less likely to see the ads and flag potential issues.[107]

118.    JUUL's social media campaign was incredibly successful. By the end of 2017 there were more than 150,000 JUUL-related "tweets" every day.[108] As of November 2018, JUUL had 77,600 Instagram followers, 19,700 Twitter followers, and 10,280 Facebook friends, all of which are dwarfed by the multitudes of YouTube videos, eleven of which have more than 1,000,000 views and over a hundred others of which have over 100,000 views.[109] A study of JUUL's official Twitter account found that 25% of its followers were youth under the age of 18 and that they often shared the tweets with other adolescents.[110]

119.    Despite JUUL's halting its own Instagram posts in November 2018, the damage has been done as a vast community of predominantly young people continue to post to #juul. "Over the 3 years and 5 months between the introduction of #juul simultaneous to JUUL's launch party (June 4, 2015) and the company's ceasing of social media marketing (November 13, 2018) more than a quarter

---

[106] JUUL Influencer Marketing Intern, https://www.internships.com/marketing/influencer-marketing-interni7391759; Chen Y. *What influencer marketing really costs.* Digiday June 5, 2017. https://digiday.com/marketing/what-influencer-marketing-costs/ (Influencers are a form of paid promotion in by which  Influencers earn money for each 100,000 followers ).

[107] Brodwin E, *Silicon Valley e-cig startup Juul 'threw a really great party' to launch its devices, which experts say deliberately targeted youth*, Business Insider (Sep. 4 2018), https://www.businessinsider.com/juul-e-cig-startup-marketing-appealed-to-teens-2018-7

[108] Jidong Huang *et al.*, *Vaping versus JUULing: how the extraordinary growth and marketing of JUUL transformed the U.S. retail e-cigarette market*, Tobacco Control, Vol. 28, Issue 2, https://tobaccocontrol.bmj.com/content/28/2/146.

[109] Jackler, *JUUL Advertising (2015-2018)* at 19.

[110] Chu, KH et al., *JUUL: Spreading Online and Offline*, Adolesc Health. 2018; 63:582-586, https://www.ncbi.nlm.nih.gov/pubmed/30348280.

of a million posts appeared. In the 8 months since the company halted its promotional postings, the rate of community posting accelerated markedly resulting in the number of posts doubling to over half a million."[111]







[111] Jackler, R, *Rapid Growth of JUUL Hashtags After the Company Ceased Social Media Promotion*, Stanford Research into the Impact of Tobacco Advertising, July 22, 2019, tobacco.stanford.edu/hashtagjuulgrowth.

120.    JUUL's web presence also included sponsored content with youth appeal, such as the promoted image below from YouTube:



5.    *Website and Emails*

121.    JUUL routinely invited those interested in using its products to its website, www.juul.com, to learn more about their offerings, to make purchases and further engage with the company. Notwithstanding JUUL's claim to employ an age verification system to prohibit underage purchases, JUUL employed no such restriction to prevent youth from engaging with JUUL and receiving solicitations. An experiment run SRITA demonstrated that JUUL's purported commitment to age verification was nothing more than a thinly veiled façade for its attempt to market to youth.

122.    "In July 2018, we [] had five underage student summer interns (ages 15-19) attempt to purchase JUUL products from the company website. All were appropriately rejected after uploading their demographic data. However, within a day each received a follow up e-mail notice that read

"*Welcome to JUUL.*" Shortly thereafter they received a series of advertising emails from JUUL including a discount coupon to buy a starter kit."[112]

**Welcome! Here is your discount code**
1 message

JUUL <hello@juulvapor.com>                                                    Mon, Jun 29, 2015 at 2:16 PM
Reply-To: JUUL <hello@juulvapor.com>
To:

JUUL    HELLO

It's powerfully satisfying.
It's smoking evolved.
It's here.

Thank you for signing up! Use this code to receive **25% off** your first purchase from JUULvapor.com:

Spread the word.

Tell your friends to sign up to enjoy **25% off**, too.

FACEBOOK    TWITTER    EMAIL

JUULVAPOR.COM    SHOP JUUL    AUTO-SHIP    STORE LOCATOR

Copyright © 2015 JUUL. All rights reserved.
You are receiving this message because you signed up to receive updates on JUULvapor.com. JUUL · 660
Alabama St. · Floor 2 · San Francisco, CA 94110 · USA

If you no longer wish to receive email from JUUL, or if you've changed your email address, manage your subscription settings here. Or if you prefer, you may unsubscribe from this list.

---

[112] Jackler, *JUUL Advertising (2015 – 2018)* at 22-23.

1

          6.    *Results of the Advertising Campaign*

2        123.    By any measure, JUUL's advertising campaign was wildly successful. "If you want to

3 advertise to adolescents, you don't use super old people and you don't use adolescents. Every

4 adolescent wants to be a successful 20- to 25-year-old … and that's what the Juul ads were." [113]

5        124.    Due to increasing regulatory scrutiny, JUUL has since deleted a large portion of its on-

6 line social media history. In July 2018, a JUUL spokesperson said that it worked with social media

7 companies to remove youth-oriented content including 4000 posts from Instagram and Facebook. Its

8 entire inventory of communications from its Vaporized campaign has been expunged from the internet

9 and as of November 2018, JUUL ceased using Instagram and Facebook in the United States.[114]

10        125.    At this point, even JUUL had to admit that its product had proliferated across an

11 underage population. Indeed, in November 2018, Kevin Burns, current CEO of JUUL Labs stated,

12 "[u]ser-generated social media posts involving JUUL products or our brand are proliferating across

13 platforms and must be swiftly addressed. There is no question that this user-generated social media

14 content is linked to the appeal of vaping to underage users. This is why we have worked directly with

15 social media platforms to remove tens of thousands of inappropriate posts." [115]

16        126.    JUUL's effort to now address underage usage, however, was widely seen for what it

17 truly was—marketing spin by a company now under siege.[116]

18        127.    Despite halting its own Instagram posts in November 2018, after the FDA demanded

19 JUUL identify "the steps [it] intend[s] to take to address youth use of [its] product,"[117] a vast

20

21

---

22 [113] *Supra* n. 40.

23 [114] *JUUL Labs implements new social media policy* (June 14, 2018),
https://newsroom.juul.com/2018/06/14/juul-labs-implements-new-social-media-policy/.

24 [115] *Juul Labs Action Plan*, Message From Kevin Burns, CEO, JUUL Labs (November 13, 2018),
25 https://newsroom.juul.com/2018/11/13/juul-labs-action-plan/.

26 [116] Roose, K., *Juul's Convenient Smoke Screen*, The New York Times (Jan. 11, 2019),
https://www.nytimes.com/2019/01/11/technology/juul-cigarettes-marketing.html

27 [117] FDA letter to Kevin Burns, September 12, 2018, https://www.fda.gov/media/119669/download.

28

community, predominantly young people, continue to post to #juul, which as of January 2019 had 336,308 posts.[118] The quarter of a million followers of #juul on Instagram, however, is dwarfed by the multitudes of YouTube videos which includes 11 with greater than 1,000,000 views and 109 with greater than 100,000 views.[119]

## VI.     AFTERMATH – THE EPIDEMIC

128.     "JUUL e-cigarettes now dominate the American vapor market and have achieved a cult level of popularity among school aged adolescents."[120] With JUUL's success, came what medical experts called "a Juul-driven youth nicotine epidemic."[121]

129.     On the heels of this realization—that youth who never smoked, and who should never smoke, were addicted to vaping and particularly to JUULing in startling and ever-increasing numbers—FDA Commissioner Scott Gottlieb announced that he was creating a Youth Tobacco Prevention Plan aimed at stopping the dramatic rise in the use of e-cigarette and tobacco products among youth. The FDA specifically asked JUUL Labs for documents related to product marketing and research on the health, toxicological, behavioral, or physiological effects of their products to understand why youths are so attracted to them. Without waiting for an answer, however, on October 4, 2018, the FDA conducted a surprise visit to JUUL in which it seized thousands of pages of documents as part of the agency's investigation into the company's marketing practices.[122]

> The troubling reality is that electronic nicotine delivery systems (ENDS) such as e-cigarettes have become wildly popular with kids. We understand, by all accounts, many of them may be using products that closely resemble a USB

---

[118] Jackler, *JUUL Advertising (2015 – 2018)* at 23.

[119] Jidong Huang *et al.*, *Vaping versus JUULing: how the extraordinary growth and marketing of JUUL transformed the U.S. retail e-cigarette market*, Tobacco Control, Vol. 28, Issue 2, https://tobaccocontrol.bmj.com/content/28/2/146.

[120] Jackler, *JUUL Advertising (2015 – 2018)* at 1.

[121] Chaykowski, *The Disturbing Focus Of Juul's Early Marketing Campaigns*, Forbes (Nov. 16, 2018), https://www.forbes.com/sites/kathleenchaykowski/2018/11/16/the-disturbing-focus-of-juuls-early-marketing-campaigns/#50c4781314f9.

[122] Medical Express, *FDA seizes documents from E-cigarette maker JUUL* (Oct. 4, 2018), https://medicalxpress.com/news/2018-10-fda-seizes-documents-e-cigarette-maker.html.

flash drive, have high levels of nicotine and emissions that are hard to see. These characteristics may facilitate youth use, by making the products more attractive to children and teens. These products are also more difficult for parents and teachers to recognize or detect. Several of these products fall under the JUUL brand…. In some cases, our kids are trying these products and liking them without even knowing they contain nicotine. In addition, that's a problem, because as we know the nicotine in these products can rewire an adolescent's brain, leading to years of addiction. For this reason, the FDA must – and will – move quickly to reverse these disturbing trends, and, in particular, address the surging youth uptake of JUUL and other products.[123]

The FDA stated it would take several actions to address issues it identified as problematic including a crackdown on retailers illegally selling JUUL products to minors, encouraging online retailers such as eBay to adopt new measures to prevent black-market listings of JUUL products, and conducting an investigation of manufacturers such as JUUL to "hold them accountable" and to "examine all the available information to understand why kids are finding these products so appealing."

130.    According to preliminary data from the CDC's annual National Youth Tobacco Survey, about three million, or 20 percent of high school students, are using e-cigarettes compared with 1.73 million (11.7 percent) in the last survey.[124] Acknowledging that we now face an "epidemic of youth e-cigarette use," the U.S. Surgeon General stated, "[t]he recent surge in e-cigarette use among youth, which has been fueled by new types of e-cigarettes that have recently entered the market, is a cause for great concern. We must take action now to protect the health of our nation's young people.[125]

131.    Under pressure from regulators, public interest groups and the medical community, on June 12, 2018, JUUL announced a new Marketing and Social Media Policy to use only adult models who are former smokers who switched to JUUL.[126] In early 2019 JUUL embarked on its new

---

[123] *Statement from FDA Commissioner Scott Gottlieb, M.D., on new enforcement actions and a Youth Tobacco Prevention Plan to stop youth use of, and access to, JUUL and other e-cigarettes*, April 24, 2018, https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm605432.htm

[124] *Supra* nn.13 & 16.

[125] CDC, *Surgeon General's Advisory on E-cigarette Use Among Youth*, https://www.cdc.gov/tobacco/basic_information/e-cigarettes/surgeon-general-advisory/index.html.

[126] Woolf J., *E-Cig Maker Juul Won't Tempt Instagrammers With Models Anymore*, Bloomberg (June 14, 2018), https://www.bloomberg.com/news/articles/2018-06-14/e-cig-maker-juul-won-t-tempt-instagrammers-with-models-anymore.

advertising campaign, "Make the Switch – For smokers. By design," which featured adult tobacco smokers. While the new campaign is widely considered a thinly veiled attempt to rehabilitate a company that, "knowingly targeted minors with harmful products, and cleaned up its act only after public pressure," its new focus and imagery serves to highlight the egregious nature of its earlier advertising campaigns and the feasibility of having marketed responsibly from the outset.[127]

**2015**                                                **2019**

                                    

132.     Bradley Tusk, a political strategist known for helping startups navigating regulatory gray spaces, summed it up succinctly. "The company needs to decide whether it wants to be the bad guy or the good guy in this debate… [I]f it has aspirations to be around for decades, then it needs to own up to the misstep, and actively change its marketing strategy and product so it doesn't fall into

---

[127] Roose, K., *Juul's Convenient Smoke Screen*, The New York Times (Jan. 11, 2019), https://www.nytimes.com/2019/01/11/technology/juul-cigarettes-marketing.html.

1  hands of teens…. If you were serious about not attracting teens, you wouldn't make products that seem

2  inherently appealing to children."[128]

3       133.    JUUL's current advertising campaign is no longer youthful, playful, attractive or cool.

4  It stands in stark contrast to its earlier advertising campaign that ushered in a youth vaping epidemic.

5  Its 'Switch,' however, is simply too little too late.



[128] https://www.inc.com/will-yakowicz/juul-has-a-problem-its-too-cool.html

### VII.    PLAINTIFF HAS SUFFERED DAMAGES AND REQUIRES DIAGNOSTIC TESTING AND MITIGATION

134.    The JUUL device and pods were defectively designed because they contained more nicotine than JUUL represented; they contained more nicotine than reasonable consumers expected; they delivered higher levels of nicotine than JUUL represented; they delivered higher levels of nicotine than reasonable consumers expected; they contained and delivered numerous toxic compounds including compounds that are cytotoxic, mutagenic, carcinogenic and teratogenic, which reasonable consumers would not have expected; they posed a greater addiction risk than JUUL represented; they posed a greater addiction risk than reasonable consumers expected; they increased users' susceptibility to a variety of medical maladies, including but not limited to: insulin resistance; increased risk of heart attack and stroke; suppressed appetite; lung disease, chronic bronchitis; oral, esophageal, and pancreatic cancers; osteoporosis and bone fractures; infertility and impairment of prefrontal brain development, none of which JUUL warned of; and because the JUUL system confers no benefit to outweigh any of these risks or all of them taken together.

135.    Plaintiff and Class Members each were users of JUUL devices through which they were unknowingly exposed to a host of toxic compounds along with unnecessary and excessive levels of nicotine.

136.    By using the JUUL system, all Class Members were significantly exposed to toxic compounds and excessive levels of nicotine to which they would never have been exposed but for use of the JUUL product.

137.    Even brief use of JUUL can lead to nicotine addiction and expose the user to a variety of toxic compounds, which increases the user's risk of developing a range of medical maladies identified in this Complaint. Continued use of the JUUL can further exacerbate the nicotine addiction as well as further increase the likelihood of developing diseases associated with prolonged use.

138.    Defendants were fully aware of the dangers of the JUUL as they specifically designed the product to carry excessive amounts of nicotine facilitated through a proprietary formulation of nicotine and benzoic acid.[129]

139.    Defendants' negligence, fraudulent concealment, omissions of material fact and failure to warn of the product defect and risks of exposure to high levels of nicotine and other toxic compounds have caused Plaintiff and the Class to suffer an increased risk of medical maladies.

140.    Absent Defendants' negligence, fraud, breach of duties, misrepresentations, or any combination of such acts, Plaintiff and Class Members would not have been exposed to dangerous levels of nicotine and other toxic compounds.

141.    As a proximate result of Defendants' misconduct, Plaintiff and the Class are currently fighting the consequences of nicotine addiction and are at a heightened risk of developing a variety of medical conditions in the future. Such increased risk was reasonably foreseeable to Defendants.

142.    As a direct result of Defendants' conduct, Plaintiff and the Class are in need of nicotine addiction cessation programs as well as costly and long-term diagnostic testing. Specifically, the cost of the monitoring procedures that are reasonably necessary to enable Plaintiff and the Class to obtain detection and diagnosis of conditions related to nicotine addiction and exposure to aerosolized nicotine, and the toxins that accompany it, are necessary because of Defendant's tortious conduct described here.

143.    Diagnostic testing for early signs or symptoms and conditions resulting from nicotine addiction and exposure to aerosolized nicotine, and the toxins that accompany it, are reasonably medically necessary to assure early diagnosis and effective treatment of the harm from exposure. The testing necessitated from this exposure was a reasonably foreseeable consequence of Defendants' tortious conduct.

---

[129] '895 Patent.

144. Monitoring procedures exist that comport with contemporary scientific principles and make possible early detection of conditions that Plaintiff and members of the Class are at increased risks of developing.

145. Plaintiff and the Class seek as damages the costs of such diagnostic testing for the early detection of injury to allow for early treatment beneficial to Plaintiff and the Class. Diagnosis of one specific condition in the course of the diagnostic testing does not foreclose diagnostic testing for other, yet undiagnosed condition, but rather indicates further testing within the program. Diagnostic testing will identify the need for adequate treatment, management, and rehabilitation in the event a nicotine/vaping related condition is diagnosed. Such diagnostic testing will be beneficial to Plaintiff and the Class.

146. Separately and in addition, Defendants' negligence, fraudulent concealment, omissions of material fact, and failure to warn, have caused the reasonable need for mitigation of nicotine addiction and attendant medical maladies suffered by Plaintiff and Class Members. Such mitigation is common to Plaintiff and Class and the need for such mitigation requires an award of the cost of such mitigation to Plaintiff and the Class.

147. Thus, Plaintiff and the Class further seek an award of damages of the cost of reasonably medically necessary common mitigation.

148. As an alternative to the award of damages to Plaintiff and the Class, to be administered by Plaintiff and the Class, Plaintiff and the Class respectfully request the Court to establish a Court-administered fund for the damages awarded.

149. Plaintiff and the Class also seek all other available and necessary relief in connection with this claim.

## VIII.    CLASS ACTION ALLEGATIONS

150. Plaintiff seeks relief on behalf of himself and as representatives of all others who are similarly situated. Pursuant to Fed. R. Civ. P. Rule 23(a), (b)(2), (b)(3) and (c)(4), Plaintiff seeks certification of classes defined as follows:

All persons in the United States who, at the time of their use of JUUL Products, were under the age of 21, and who procured and used JUUL Products (the "Class").

All residents of Louisiana who, at the time of their use of JUUL Products, were under the age of 21, and who procured and used JUUL Products (the "Louisiana Subclass").

151.    Excluded from the Class and Subclass (referred to throughout the complaint separately and together as "the Class" or "Class Members") are Defendants and any of their affiliates, parents or subsidiaries; all persons who make a timely election to be excluded from the Class; government entities; and the judges to whom this case is assigned, their immediate families, and court staff.

152.    Plaintiff reserves the right to amend or modify the class definitions with greater specificity or division after having had an opportunity to conduct discovery.

153.    The proposed Class and Subclass meet the criteria for certification under Rule 23(a), (b)(2), (b)(3) and (c)(4).

154.    **Numerosity. Fed. R. Civ. P. 23(a)(1).** Consistent with Rule 23(a)(1), the members of the Class and Subclass are so numerous and geographically dispersed that the joinder of all members is impractical. While the exact number of vehicle purchasers is unknown, upon information and belief, Defendants sell millions of JUUL devices and pods every year and therefore meet the numerosity requirement of 23(a)(1).

155.    **Commonality – Fed. R. Civ. P. 23(a)(2) and (b)(3).** Consistent with Rule 23(a)(2) and with 23(b)(3)'s predominance requirement, this action involves common questions of law and fact that predominate over any questions affecting individual Class and Subclass Members. The common questions include:

      a.    Whether Defendants' advertising and marketing regarding the JUUL e-cigarette and JUUL pods were likely to deceive Class and Subclass Members;

      b.    Whether Defendant's advertising and marketing regarding the JUUL e-cigarettes and JUUL pods were unfair to Class and Subclass Members;

      c.    Whether Defendants intentionally omitted material safety information from their advertising and marketing materials;

d. Whether Defendants unfairly, unlawfully, and/or deceptively induced Class and Subclass Members to purchase JUUL e-cigarettes and/or JUUL pods by omitting to disclose that they are at least as addictive as traditional cigarettes if not more so;

e. Whether Defendants unfairly, unlawfully, and/or deceptively induced Class and Subclass Members to purchase JUUL e-cigarettes and/or JUUL pods by omitting to disclose (i) the true levels of nicotine in their product, both in terms of content and delivery, and (ii) the existence of toxic additives and other compounds and the chemicals delivered in JUUL vapor by virtue of the additives' and other compounds' presence in JUUL e-liquid;

f. Whether Defendants engaged in the alleged conduct knowingly, recklessly, or negligently;

g. Whether JUUL owed a duty of care to the Class and Subclass;

h. Whether the duty of care owed to Class and Subclass Members included the duty to warn about the dangers of its products;

i. Whether JUUL breached its duty to warn Class and Subclass Members of and protect the Class and Subclass Members from the long-term health risks and consequences of exposure to high levels of aerosolized nicotine;

j. Whether Class and Subclass Members have been significantly exposed to harmful and toxic chemicals by using the JUUL devices;

k. Whether Class and Subclass Members have suffered an increased risk of illness, disease or disease process from the exposure caused by using the JUUL products;

l. Whether diagnostic testing for the early detection of illness, disease or disease process in Class and Subclass Members from the exposure caused by using the JUUL products is reasonably medically necessary;

m. Whether diagnostic testing procedures exist for the early detection of illness, disease or disease process from the exposure cause by using the JUUL products;

n.  Whether mitigation programs exist for the early treatment of nicotine addiction caused by using the JUUL products;

o.  Whether mitigation programs for the early treatment of nicotine addiction caused by using the JUUL products are medically reasonably necessary for Class and Subclass Members;

p.  The amount of revenues and profits Defendants received and/or the amount of monies or other obligations lost by Class and Subclass Members as a result of such wrongdoing;

q.  Whether Class and Subclass Members are entitled to injunctive and other equitable relief and, if so, the nature of such relief; and

r.  Whether Class and Subclass Members are entitled to payment of actual, incidental, consequential, exemplary, and/or statutory damages plus interest, and if so, the nature of such relief.

156.  **Typicality – Fed. R. Civ. P. 23(a)(3).** Consistent with Rule 23(a)(3), Plaintiff's claims are typical of the Class and Subclass Members' claims because, among other things, Plaintiff and the Class and Subclass Members were injured through Defendant's substantially uniform misconduct. Plaintiff is advancing the same claims and legal theories on behalf of himself and the Class and Subclass Members, and there are no defenses that are unique to Plaintiff's claims.  Plaintiff and Class and Subclass Members' claims arise from the same operative facts and are based on the same legal theories.

157.  **Adequacy – Fed. R. Civ. P. 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiff is adequate representatives of the Class and Subclass because Plaintiff is a member of the Classes he seeks to represent; is committed to pursuing this matter against Defendants to obtain relief for the Classes; and has no conflicts of interest with the Classes. Moreover, Plaintiff's Counsel are competent and experienced in litigating class actions, including litigation of this kind. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the Class and Subclass Members' interests.

158.    **Superiority – Fed. R. Civ. P. 23(b)(3).** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The quintessential purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to an individual plaintiff may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiff and the Class/Subclass are relatively small compared to the burden and expense required to individually litigate their claims against Defendants, and thus, individual litigation to redress Defendants' wrongful conduct would be impracticable. Individual litigation by each Class or Subclass member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

159.    **Injunctive and Declaratory Relief.** Class certification also is appropriate under Rule 23(b)(2) and (c). In addition to or in the alternative to the above, Plaintiff brings this class action under Rule 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class and Subclass Members as a whole, such that final injunctive relief is appropriate with respect to the Class and Subclass Members as a whole.

160.    Such injunctive relief includes, but is not limited to, the implementation and funding of a medical monitoring program for the Plaintiff and the Class and Subclass Members sufficient to monitor the health of Plaintiff and the Class/Subclass Members to ensure the beneficial early detection of illness, disease and disease processes caused by exposure to Defendants' JUUL Products.

161.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

## IX.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### FRAUD BY OMISSION
### (On Behalf of the Class and State Subclass)

162.    Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 161 as though fully stated herein.

163.    Defendants fraudulently and deceptively sold JUUL products to Plaintiff and Class Members by omitting to disclose the highly addictive nature of JUUL products.

164.    Further, Defendants fraudulently and deceptively failed to disclose to Plaintiff and Class Members the highly addictive nature of JUUL's pod formulation, the nicotine content of JUUL e-liquid and the aerosol it produces, and use of nicotine and benzoic acid to deliver a materially more significant nicotine load than in a single package of cigarettes.

165.    Further, Defendants fraudulently and deceptively failed to disclose to Plaintiff and Class Members that the nicotine salts in JUUL pods delivered nicotine at a higher rate than other e-cigarettes and conventional cigarettes, which was likely to make the nicotine addiction associated with JUUL products stronger and more severe than that associated with other e-cigarettes and conventional cigarettes.

166.    Each of these safety omissions was material when made. In particular, each omission concerned material facts that were essential to Plaintiff and Class Members' decisions whether to purchase a JUUL e-cigarette and JUUL pod.

167.    By and through such omissions, Defendants intended to induce Plaintiff and Class Members to detrimentally rely on the material safety omissions.

168.    Plaintiff and Class Members detrimentally relied on Defendants' omissions. Had Plaintiff and Class Members been adequately informed and not intentionally deceived by Defendants, they would have acted differently by, without limitation not purchasing a JUUL e-cigarette or JUUL pod or purchasing fewer of them.

169.    Plaintiff and Class Members justifiably and reasonably relied on Defendants' omissions, and, accordingly, were damaged by the Defendants' actions.

170.    As a direct and proximate result of Defendants' omissions, Plaintiff and Class Members have suffered damages in an amount equal to the amount that Defendants charged them.

171.    Defendants' conduct was willful and malicious and designed to maximize Defendants' profits even though Defendants knew that it would cause damages to Plaintiff and Class Members.

## SECOND CAUSE OF ACTION
### NEGLIGENCE
**(On Behalf of the Class and State Subclass)**

172.    Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 161 as though fully stated herein.

173.    Upon marketing and offering the JUUL products for sale, Defendants had a duty and owed a duty to Plaintiff and Class Members to exercise a degree of care a reasonable e-cigarette manufacturer would exercise under like circumstances to ensure its products were not marketed or sold to and/or used by youth, including Plaintiff and Class Members.

174.    Defendants knew or should have known that youth, including Plaintiff and Class Members, would be prone to purchase and/or try JUUL products.

175.    Defendants breached their duty to youth, including Plaintiff and Class Members, by permitting their products to be marketed and sold to youth, including Plaintiff and Class Members, through their website, online, and through brick-and-mortar retailers.

176.    Upon marketing and offering the JUUL products for sale, Defendants had a duty and owed a duty to Plaintiff and Class Members to exercise a degree of care a reasonable e-cigarette manufacturer would exercise under like circumstances to accurately represent the nicotine content and delivery of their products as well as the products' corresponding addictive potential.

177.    Defendants breached their duty to youth, including Plaintiff and Class Members, by misrepresenting and otherwise failing to accurately represent the nicotine content and delivery of their products as well as by misrepresenting and otherwise failing to accurately represent the products' corresponding addictive potential.

178.    Upon marketing and offering the JUUL products for sale, Defendants had a duty and owed a duty to Plaintiff and Class Members to exercise a degree of care a reasonable e-cigarette

manufacturer would exercise under like circumstances to accurately represent and to adequately warn of the health hazards, particularly to youth, of using JUUL products including, but not limited to, the presence of toxic compounds in JUUL e-liquids and the delivery of these compounds and other toxic compounds in JUUL aerosol as well as the health hazard of nicotine addiction and the concomitant health hazards that addictive, i.e., compulsive use of the JUUL products would bring about.

179.    Defendants breached their duty to youth, including Plaintiff and Class Members, by failing to accurately represent and adequately warn of the health hazards of using JUUL products including, but not limited to, those identified in the preceding paragraph.

180.    Defendants' breach of their duties, and each of them, proximately caused harm to Plaintiff and Class Members. But for Defendants' breach of their duties, such harms would not have occurred.

181.    Because of Defendants' conduct, Plaintiff and Class Members have been significantly exposed to toxic substances, including nicotine, additives, and other toxic compounds in JUUL e-liquid and delivered in the aerosol JUUL produces, and as a result of this exposure, have suffered increased risk of illness, disease or disease process, requiring an award of the cost of a program for monitoring for detection of such illness, disease process or disease. Early detection of illness, disease or disease process will benefit Plaintiff and Class Members.

182.    Because of Defendants' conduct, Plaintiff and Class Members have been significantly exposed to toxic substances, including nicotine, additives, and other toxic compounds in JUUL e-liquid and delivered in the aerosol JUUL produces, and as a result of this exposure, they have suffered the need for smoking/vaping education and cessation counseling, requiring an award of the cost of a program for education and cessation.

183.    Defendants' lack of sufficient disclosure was a substantial factor in causing harm to Plaintiff and Class Members.

184.    In addition, Plaintiff seeks the cost of diagnostic testing to monitor for use of nicotine metabolites and for the early detection of illness, disease, and disease process, the cost of nicotine use cessation programs, and other remedies.

### THIRD CAUSE OF ACTION
### UNJUST ENRICHMENT
### (On Behalf of the Class and State Subclass)

185.    Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 184 as though fully stated herein.

186.    By means of Defendants' wrongful conduct alleged here, Defendants knowingly sold JUUL e-cigarettes and JUUL pods to Plaintiff and Class Members in a manner that was unfair, unconscionable, and oppressive. Specifically, Defendants engaged in advertising campaigns and other unfair, unconscionable, and oppressive acts that resulted in the sale and collection of monies from youths, which Defendants intended to occur.

187.    Defendants knowingly received and retained wrongful benefits and funds from Plaintiff and Class Members. In so doing, Defendants acted with conscious disregard for the rights of Plaintiff and Class Members.

188.    Because of Defendants' wrongful conduct, Defendants have been unjustly enriched at the expense of, and to the detriment of, Plaintiff and Class Members.

189.    Defendants' unjust enrichment resulted from the conduct alleged here. Specifically, Defendants knowingly marketed, sold to, and profited from youths' purchases of JUUL nicotine dispensing devices and nicotine products whose quality and performance were misrepresented by words, acts, and omissions described in this Complaint.

190.    It is inequitable for Defendants to be permitted to retain the benefits they received, without justification, from selling JUUL nicotine-dispensing devices and nicotine products to Plaintiff and Class Members in an unfair, unconscionable, and oppressive manner. Defendants' retention of such funds under such circumstances makes it inequitable, and constitutes unjust enrichment.

191.    The financial benefits Defendants derived rightfully belong to Plaintiffs and Class Members. Defendants should be compelled to return in a common fund for the benefit of Plaintiff and Class Members all wrongful or inequitable proceeds received by them from the sale of JUUL nicotine dispensing devices and nicotine products to youths.

192.    Plaintiff and members of the Class allege in the alternative that they have no adequate remedy at law.

### FOURTH CAUSE OF ACTION
### STRICT PRODUCT LIABILITY – FAILURE TO WARN
#### (On Behalf of the Class and State Subclass)

193.    Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 161 as though fully stated here.

194.    This claim is brought pursuant to the product liability laws of the State of Louisiana.

195.    Defendants manufactured, distributed and sold JUUL nicotine-dispensing devices and nicotine products.

196.    Defendants were aware that the JUUL nicotine-dispensing devices and nicotine products had potential safety risks that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of design, manufacture, distribution, and sale of JUUL nicotine dispensing devices and nicotine products.

197.    The use of JUUL nicotine-dispensing devices and nicotine products presented a substantial danger of causing nicotine addiction when Plaintiff and Class Members used a JUUL nicotine dispensing devices or nicotine products in an intended or reasonably foreseeable way.

198.    Plaintiff and Class Members could not recognize the potential risks of using a JUUL nicotine-dispensing devices and nicotine products because Defendants intentionally downplayed, misrepresented, and/or failed to warn of (a) the levels of nicotine present in JUUL e-liquid and the levels of nicotine delivered in the aerosol JUUL produces when used in an ordinary manner; and (b) the addiction potential that the JUUL nicotine-dispensing devices and nicotine products posed; and (c) the presence of toxic additives and other toxic compounds in JUUL e-liquid and the delivery of those and other toxic compounds in the aerosol JUUL produces when used in an ordinary manner; and (d) the host of attendant medical maladies that could result from ordinary use of the products.

199.    Defendants failed to adequately warn or instruct foreseeable users of JUUL nicotine-dispensing devices and nicotine products of the risks of nicotine addiction and the concomitant health hazards that addictive, i.e., compulsive, use of the JUUL products would bring about.

200. Plaintiff and Class Members were harmed by Defendants' failure to warn.

201. As a result of Defendants' conduct, Plaintiff and Class Members have been significantly exposed to toxic substances, including nicotine and nicotine delivery additives, and as a result of this exposure have suffered increased risk of illness, disease or disease process, requiring an award of the cost of a program for monitoring for detection of such illness, disease process or disease. Early detection of illness, disease or disease process will benefit Plaintiff and Class Members.

202. Because of Defendants' conduct, Plaintiff and Class Members have been significantly exposed to toxic substances, including nicotine and nicotine delivery additives, and because of this exposure to an addictive substance have suffered the need for smoking/vaping education and cessation counseling, requiring an award of the cost of a program for education and cessation.

203. Defendants' lack of sufficient instructions or warnings was a substantial factor in causing harm to Plaintiff and Class Members.

204. In addition, Guardian Class Members seek the cost of diagnostic testing for the early detection of illness, disease, and disease process, the cost of nicotine use cessation programs, and other remedies.

**FIFTH CAUSE OF ACTION**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(On Behalf of the Class and State Subclass)**

205. Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 161 as though fully stated herein.

206. Defendants, through the acts and omissions alleged herein, in the sale, marketing, and promotion of JUUL products impliedly warranted that JUUL e-cigarettes and cigarettes were equivalent in terms of nicotine content.

207. The negligent misrepresentations and omissions made by Defendants, upon which Plaintiff and Class Members reasonably and justifiably relied, were intended to induce, and actually induced, Plaintiff and all Class Members to purchase the products at issue.

208. Defendants are merchants with respect to the goods, which were sold to Plaintiff and the Class, and there was an implied warranty that those goods were merchantable.

209.    JUUL e-cigarettes are not fit for their intended purposes of offering an alternative to cigarettes because JUUL e-cigarettes, when used as intended or reasonably foreseeable, worsen or aggravate users' underlying nicotine addiction.

210.    Plaintiff and the Class would not have purchased JUUL e-cigarettes, or would not have purchased the products on the same terms, had they known the facts Defendants omitted to disclose.

211.    Plaintiff and Class Members are entitled to damages and other legal and equitable relief as a result.

**SIXTH CAUSE OF ACTION**
**LOUISIANA PRODUCT LIABILITY ACT**
**L.P.L.A. §§La.R.S. 9:2800.51 et seq.**
**(Individually and on behalf of the Louisiana Subclass)**

212.    Plaintiff, individually, and on behalf of the Louisiana Subclass realleges and incorporates by reference each of the allegations contained in the preceding paragraphs as though fully asserted herein.

213.    The express purpose of the Louisiana Products Liability Act ("LPLA") is to protect the public from the damages caused by a manufacturer's product.

214.    Defendants herein manufactured the JUUL products used by Plaintiff and the Louisiana Subclass.

215.    As stated above, the JUUL Product herein possessed characteristics which made it unreasonably dangerous.

216.    The JUUL product's unreasonably dangerous characteristics proximately caused Plaintiff and the Louisiana Subclass injury and damages.

217.    Plaintiff's and the Louisiana Subclass' injury arose from a reasonably anticipated use of the JUUL products.

218.    For the reasons detailed above, the JUUL products were unreasonably dangerous in their construction and/or composition; in their design; Defendants failed to provide Plaintiff and the Louisiana Subclass adequate warning about the JUUL products; and the JUUL products did not

conform to Defendant's express warranty regarding, among other things to be proven at the trial of this matter, their nicotine contents.

219.    Therefore, as a result of Defendants' above conduct, Plaintiff and the Louisiana Subclass are entitled to recover compensatory damages.

220.    As described above, Defendants' actions were reckless, willful and wanton.

221.    Therefore, Plaintiff and the Louisiana Subclass are entitled to an award of punitive damages together with attorneys' fees.

## X.    **DEMAND FOR JURY TRIAL**

222.    Plaintiffs, on behalf of themselves and on behalf of all Class Members and all Members of each respective Subclass, demand jury trial on all issues so triable.

## XI.    **PRAYER FOR RELIEF**

223.     WHEREFORE, Plaintiff, on behalf of himself and on behalf of the Class and Subclass identified above, respectfully requests the following relief:

    a.   An Order certifying this case as a class action;

    b.   An Order appointing Plaintiff as the class and subclass representative;

    c.   An Order appointing undersigned counsel as class and subclass counsel;

    d.   All appropriate injunctive relief including a mandatory injunction directing the Defendants to provide medical monitoring and appropriate injunctive relief pertaining to Defendants' marketing practices;

    e.   All other appropriate equitable relief including disgorgement, restitution, and such other relief as is allowed in law or in equity;

    f.   An award of damages, including at least compensatory and punitive damages;

    g.   An award of costs and expenses;

    h.   An award of attorneys' fees;

    i.   Such other and further relief as this court may deem just and proper; and

    j.   Trial by jury on all issues so triable.

Dated: February 12, 2020.

**PROVOSTY & GANKENDORFF, L.L.C.**


*/S/ Eric R. G. Belin*
Eric R.G. Belin (LA Bar #: 27168)
Henry Saint Paul Provosty (Bar #02056)
Edgar D. Gankendorff (Bar #20550)
650 Poydras St. Suite 2700
Tel: (504) 410-2795
**ebelin@provostylaw.com**
**egankendorff@provostylaw.com**
**hprovosty@provostylaw.com**


**LEVIN, PAPANTONIO, THOMAS,
MITCHELL, RAFFERTY & PROCTOR,
P.A.**
Matt Schultz
(*Pro Hac Vice to be submitted*)
316 South Baylen Street
Pensacola, FL 32502
Tel: 850-435-7140
mschultz@levinlaw.com

***Attorneys for Plaintiff***